ST. PAUL INSURANCE COMPANIES, a corporation, Plaintiff-Appellee,

v.

TALLADEGA NURSING HOME, INC., et al., Defendants-Appellants.

No. 77–2774.

United States Court of Appeals, Fifth Circuit.

Nov. 15, 1979.

---

Thomas Reuben Bell, Jerry L. Fielding, Sylacauga, Ala., for defendants-appellants.

Reid B. Barnes, Lyman H. Harris, Birmingham, Ala., for plaintiff-appellee.

Philip Dale Segrest, Montgomery, Ala., for Cook & Mountainview.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

GODBOLD, Circuit Judge:

This case involves the liability of an insurance company, under a comprehensive nursing home liability policy, to indemnify and defend the insured in civil actions alleging slander, interference with business relations, and violations of the federal antitrust laws. The district court held that such allegations constitute intentional wrongs and that it is against Alabama public policy to insure against the consequences of intentional wrongs. We affirm.

Appellants William and Hazel Patterson together own 59 shares out of 60 of the Talladega Nursing Home, Inc., and are directors and administrators of the Nursing Home. Both the Pattersons and the Nursing Home were insured by St. Paul's comprehensive nursing home liability policy. Under this policy, St. Paul agreed to pay "all loss by reason of the liability imposed by law or contract upon the Insured for damages . . . on account of injury. . . ." Injury is defined in the contract as "both bodily and personal injury claims (such as libel, slander, invasion of privacy, false detention, etc.)." St. Paul also agreed to defend the Insured in any suit alleging a covered injury, "even if such suit is groundless, false or fraudulent." In 1975, while the St. Paul insurance contract was in force, Ottis D. Cook initiated a civil action in federal district court in Alabama against the Pattersons and the Nursing Home, alleging, in essence, that appellants had intentionally and unlawfully prevented him from successfully operating a rival nursing home in Talladega.[1] In a nine-count complaint, Cook alleged that appellants' acts had amounted to slander, interference with business relations, and violation of the federal antitrust laws. In their answer appellants denied all the material allegations in the complaint and have claimed before this court that the allegations therein are groundless, false or fraudulent. St. Paul then instituted the instant action in federal district court, seeking a declaratory judgment as to its duty to defend. This appeal is taken from the district court's ruling that St. Paul is not obligated to defend the underlying actions.

Appellants argue, first, that Alabama public policy does not prohibit insuring against all intentional wrongs; second, that the allegations of the underlying complaint do not constitute intentional wrongs; and third, that St. Paul's duty to defend is broader than its indemnification liability, so that even if public policy precludes indemnification, St. Paul must still defend the actions.

In *Fidelity-Phenix Fire Ins. Co. v. Murphy,* 226 Ala. 226, 146 So. 387 (1933), the Alabama Supreme Court, in the context of the willful and deliberate destruction of the insured's ship by the insured, held void as against public policy any insurance coverage protecting against "loss which [the insured] may purposely and willfully create." *Id.* at 230, 146 So. at 390. In *Pruet v. Dugger-Holmes & Assoc.,* 276 Ala. 403, 162 So.2d 613 (1964), this doctrine was extended to include a suit for intentional trespass. These two cases have been interpreted to hold that all contracts insuring against loss from intentional wrongs are void in Alabama as against public policy. *See Industrial Sugars, Inc. v. Standard Accident Ins. Co.,* 338 F.2d 673, 676 (CA7, 1964); *Thomason v. United States Fidelity & Guaranty Co.,* 248 F.2d 417, 420 (CA5, 1957) (Rives, J., dissenting). Appellants' contention that the intentional wrongs doctrine is narrowly circumscribed, and limited to such egregious

1. Cook also initiated a similar action in the Circuit Court of Talladega County, alleging slander and malicious interference with his right to do business. The federal district court held St. Paul had no obligation to defend this action. The same considerations govern St. Paul's liability to defend this state action as apply to Cook's federal suit.

acts as arson, is without merit; the crucial question, therefore, is whether the acts alleged in the underlying complaint constitute intentional wrongs.

 Intentional wrongs are defined in Alabama, in the context of insurance, as including both intentionally causing injury and "intentionally doing some act which reasonable and ordinary prudence" would indicate likely to result in injury. *Hartford Fire Ins. Co. v. Blakeney*, 340 So.2d 754, 756 (Ala.1976); *accord, Transit Casualty Co. v. Snow*, 584 F.2d 97, 99 (CA5, 1978). All of the allegations of the underlying complaint fall within this definition, both as a matter of fact and as a matter of law. A close reading of the complaint demonstrates that appellants are alleged to have committed a series of intentional acts, each of which was calculated to prevent Cook from operating a nursing home in competition with that of appellants. It is also clear from the complaint that the sole purpose of appellants'

2. It may be argued that St. Paul should be estopped from denying its duty to defend a slander action because it specifically agreed to insure against suits for slander. However, where public policy forbids a particular insurance contract, "public policy [also] forbids the accomplishment of the result by an estoppel." *Northwestern National Casualty Co. v. McNulty,* 307 F.2d 432, 442 (CA5, 1962). Moreover, the slander clause might well refer only to the Nursing Home's vicarious liability for the acts of non-administrative personnel. *Cf. Glens Falls Indemnity Co. v. Atlantic Building Corp.,* 199 F.2d 60, 62 (CA4, 1952) (drawing same distinction with regard to assault clause); *Armstrong v. Security Insurance Group,* 292 Ala. 27, 288 So.2d 134 (1973) (same).

3. It is not wholly clear whether intent, as broadly defined by Alabama law, is a necessary element of a civil antitrust action in these circumstances. While a specific intent must be shown in a criminal antitrust suit, *U. S. v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the "general rule [is] that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *Id.* at 436 n.13, 98 S.Ct. at 2873, 57 L.Ed.2d at 869. However, an examination of the Court's treatment of civil antitrust suits indicates that this simplistic rule must be qualified. While a specific intent to restrain trade may not always be necessary, a conspiracy must generally have an inherent tendency to hinder or suppress competition. *Shotkin, supra,* 171 F.2d at 238; Toulmin, VI

alleged conduct was to eliminate competition.

 Moreover, the elements of each of the underlying causes of action include either an intent to injure or the commission of acts reasonably likely to injure. *See Ceravolo v. Brown*, 364 So.2d 1155, 1156 (Ala.1978) (slander); *Marion v. Davis*, 217 Ala. 16, 18, 114 So. 357, 358 (1927) (slander);[2] *Louisville & Nashville Railroad Co. v. Arrow Transportation Co.*, 170 F.Supp. 597, 600 & n.3 (N.D.Ala.1959) (interference with business relations); *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 8 n.13, 99 S.Ct. 1551, 1556 n.13, 60 L.Ed.2d 1, 23 n.13 (1979) (Stevens, J., dissenting) (conspiracy to restrain trade); *Shotkin v. General Electric Co.*, 171 F.2d 236, 238 (CA10, 1948) (conspiracy to restrain trade); *Mabry v. State*, 40 Ala.App. 129, 135, 110 So.2d 250, 255, *cert. dismissed*, 268 Ala. 660, 110 So.2d 260 (1959) (conspiracy); *State v. Cawood*, 2 Stew. 360, 363 (Ala.1830) (conspiracy).[3]

*Antitrust Laws* § 16.23, at 418 (1951). The elements of purpose and effect are intertwined, *see Broadcast Music, Inc., supra,* 441 U.S. at 18–19, 99 S.Ct. at 1562, 60 L.Ed.2d at 16, and effect is often characterized as the natural and probable consequences of the act. As thus defined, an anticompetitive effect comes within the scope of Alabama's intentional wrongs doctrine.

It is only where the alleged restraint of trade is a per se violation of the antitrust laws that the plaintiff need prove neither intent to restrain trade nor that "such restraint is the natural and probable consequences" of his acts. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 511, 60 S.Ct. 982, 1001, 84 L.Ed.2d 1311, 1333 (1940). Indeed, the critical question in determining whether to characterize a course of conduct as a per se violation is "whether the practice facially appears to be one that would always or almost always tend to restrict competition . . . ." *Broadcast Music, Inc., supra,* 441 U.S. at 19–20, 99 S.Ct. at 1562, 60 L.Ed.2d at 16. The alleged acts of Hazel Patterson are almost certainly not per se violations, and are alleged with enough specificity that it is obvious that they are intentional. The conduct of William Patterson as a participant in the conspiracy is not alleged in sufficient detail to foreclose entirely the possibility that intent is not a necessary element as to him. However, since the essence of the alleged conspiracy is a deliberate attempt to eliminate competition, it is doubtful that any liability

■ Appellants also argue that the acts of the Pattersons cannot be attributed to the Nursing Home, and that St. Paul is obligated to defend the Nursing Home regardless of the resolution of the issue as to the Pattersons. This contention is without merit. The district court properly found Hazel Patterson to be the alter ego of the corporation,[4] and therefore held that her acts were tantamount to acts of the corporation. This is consistent with Alabama law. *Ex parte City Sales Corp., supra*; *Williams v. North Alabama Express*, 263 Ala. 581, 584, 83 So.2d 330, 333 (1955).

■ Finally, appellants contend that St. Paul's duty to defend is broader than its liability for indemnification. The insurer's duty to defend is not determined solely by the bare allegations of the complaint. *Ladner & Co. v. Southern Guaranty Ins. Co., supra*, 347 So.2d at 103; *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Harris*, 279 Ala. 326, 328, 184 So.2d 837, 838 (1966). However, in this case, as in *Ladner*, "there is nothing in the record . . . to indicate that the plaintiffs . . . are asserting any theory of liability" other than deliberate and intentional wrongs. 347 So.2d at 103. There is no duty to defend the cases in their present posture.

The judgment below is AFFIRMED.

---

could be imposed upon him for unintentional acts. Intent is "almost essential" to a conspiracy count, *Swift & Co. v. U. S.*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, 524 (1904). It is difficult to imagine how William Patterson could be a part of the conspiracy without having committed any intentional acts. Moreover, should any of the appellants be found liable on any theory other than intentional injury, on any of the underlying counts, St. Paul may at that time become liable for indemnification under the policy, this decision notwithstanding. *Ladner & Co. v. Southern Guaranty Ins. Co.*, 347 So.2d 100, 104 (Ala.1977).

4. In Alabama, the alter ego of a corporation may be either a sole or controlling owner. *U. S. v. Industrial Crane & Manuf. Corp.*, 492 F.2d 772, 774 (CA5, 1974); *Ex parte City Sales Co.*, 264 Ala. 637, 639, 88 So.2d 668, 669 (1956). Moreover, the manager of operations may also be the alter ego of a corporation. *Buchanan Contracting Co. v. Denson*, 262 Ala. 592, 594, 80 So.2d 614, 615 (1955). Hazel Patterson is both the controlling owner and a general manager of the Talladega Nursing Home.