936 F.2d 1162
 AMERICAN & FOREIGN INS. CO.; U.S. Fire Insurance Company;
Plaintiffs-Appellees,
International Insurance Company; Chubb & Sons, Inc., Plaintiffs,
v.
COLONIAL MORTGAGE CO., INC., Defendant-Appellant,
William N. Walls; Richard Ford and Emily Ford, Defendants.
 No. 90-7337.
 United States Court of Appeals,
Eleventh Circuit.
 July 25, 1991.
 
 Samuel H. Franklin, M. Christian King, Madeline H. Haikala, Lightfoot, Franklin, White & Lucas, Birmingham, Ala., for defendant-appellant.
 William Freeman Horsley, Samford, Denson, Horsley, Pettey, Martin & Barrett, Opilika, Ala., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before HATCHETT and CLARK, Circuit Judges, and PECKHAM*, Senior District Judge.
 CLARK, Circuit Judge:
 
 
 1
 U.S. Fire Insurance Company and International Insurance Company (collectively referred to as the "umbrella carriers") brought this declaratory judgment action against Colonial Mortgage Company ("Colonial") to determine the extent of the umbrella carriers' contractual obligation to Colonial. Colonial argued that it was owed coverage by the umbrella carriers in an underlying lawsuit brought against Colonial by Richard and Emily Ford. The district court granted summary judgment in favor of the umbrella carriers, holding that Colonial was not entitled to coverage in the underlying action because of "professional service" liability exclusions contained in the umbrella policies.
 
 
 2
 For the reasons stated below, we affirm the district court's grant of summary judgment.
 
 I. FACTS
 
 3
 A. Conduct Underlying Jury Verdict against Colonial.
 
 
 4
 On January 16, 1987, Richard and Emily Ford entered into a contract to sell fifty-three acres of land to William Walls for $92,000. Walls applied for a loan in order to pay for the property. Colonial's agent, Hilda Abney, told Walls and the Fords that Colonial would finance $80,000 of the purchase price at an interest rate of eight percent. Abney did not indicate that Walls would have to pay any discount points. On April 1, 1987, at the scheduled closing, Walls received the final documents and noticed that the interest rate had been changed to eight and one-half percent; he, therefore, refused to sign the documents until the matter could be corrected.
 
 
 5
 On April 2, 1987, the parties again met to close the deal. At this time, Colonial's representative presented Mr. Walls with two options: Either Mr. Walls could obtain the loan from Colonial at eight percent and pay seven discount points or he could accept the loan at eight and one-half percent and pay four discount points. Walls opted for the latter, agreeing to eight and one-half percent and four discount points. Colonial then delivered a loan closing check for $29,911.31 to the law firm handling the closing. Upon closing, the law firm disbursed the funds, including $29,911.31 to the Fords.
 
 
 6
 Immediately following the closing, Colonial advised the closing law firm that it was stopping payment on the $80,000 check and that the firm should stop payment on its checks to the parties. As the basis for its action, Colonial alleged that Walls and the Fords had misrepresented matters on their loan application.
 
 
 7
 B. Jury Verdict.
 
 
 8
 Mr. Walls and the Fords subsequently filed separate suits charging Colonial with fraudulent misrepresentation, suppression of material facts, defamation, and interference with contract relations. At the trials, the Fords and Walls presented evidence that Colonial refused to make the loan when it determined that it could not sell the mortgage on the secondary market. Instead of admitting that it had made a mistake, Colonial informed the parties that it had denied the loan because of fraud and misrepresentation on the loan application. Evidence also was presented that, after the closing, Colonial misplaced portions of the loan file.
 
 
 9
 The jury returned a verdict for Walls for $1,700,000. In the Fords' case against Colonial, the jury awarded the Fords $3,000,000. Colonial then sought coverage from American and Foreign Insurance Company ("American"), Colonial's primary insurance carrier, and from its excess coverage insurers, the umbrella carriers. Both excess coverage insurance policies contain a professional liability exclusion, which provides:MORTGAGE COMPANY PROFESSIONAL LIABILITY EXCLUSION
 
 
 10
 This policy does not apply to any professional liability arising out of the insured's profession as a mortgage company.
 
 
 11
 "Professional liability" as used in this endorsement, means liability arising out of the insured's profession as stated above and caused by the rendering or failure to render professional services for others, including professional services of any employee of the insured or of any person for whom the insured is legally liable.
 
 
 12
 All other terms and conditions of this policy remain unchanged.
 
 
 13
 * * * * * *
 
 PROFESSIONAL LIABILITY EXCLUSION
 
 14
 This policy does not apply to any professional liability claims arising out of any of the insured's activities.
 
 
 15
 "Professional liability," as used in this endorsement, means liability arising out of and caused by the rendering or failure to render professional services for others; including professional services of any employee of the insured or of any other person for whom the insured is legally liable.
 
 
 16
 All other terms and conditions of this policy remain unchanged.
 
 
 17
 C. District Court.
 
 
 18
 As grounds for their motions for summary judgment, the umbrella carriers contended that by policy definition and the exclusionary language in the professional liability exclusion, the claims made by Colonial relative to the verdicts in the Ford and Walls litigation were not covered by the policies. The district court granted the umbrella carriers' motion for summary judgment. In so concluding, the court reasoned that
 
 
 19
 the circumstances involved in the Walls and Ford litigation fit squarely within the definition set forth in the policy's professional liability exclusion. In the opinion of this court, the exclusion is not ambiguous and it applies to the present case.[1]
 
 
 20
 As to whether Colonial's activities causing the plaintiffs "humiliation," and "mental anguish" were included in the policies' personal injury limitations,[2] the court concluded that the personal injury limitation was not ambiguous, did not expand policy coverage, and could not be construed to override the professional liability exclusion. Therefore, pursuant to the unambiguous terms of the policies, the umbrella carriers had no legal duty to provide coverage in the underlying Walls and Ford cases.
 
 II. DISCUSSION
 
 21
 Summary judgment is appropriate if "there is no genuine issue as to any material fact" and if "the moving party is entitled to a judgment as a matter of law."[3] Appellate review of a grant of summary judgment is plenary.[4] Having viewed all evidence and factual inferences favorably to the nonmoving party,[5] we then must determine if the district court correctly analyzed the substantive law to determine if a grant of summary judgment was proper as a matter of law.[6] Because this is a diversity case, Alabama law governs resolution of all substantive issues.[7]
 
 
 22
 The question presented is whether the umbrella carriers' insurance policies exclude from coverage Colonial's acts of fraud against Ford and the Walls. Because we hold, as a matter of Alabama law and public policy, that the umbrella carriers' policies cannot extend coverage to the intentional and fraudulent acts of Colonial in its dealings with the Fords and Walls, we need not decide whether the district court correctly determined that Colonial's acts were excluded from coverage because they arose out of "professional services" rendered as a mortgage company.
 
 
 23
 In the Fords' suit against Colonial,[8] the Fords alleged, in a three-count complaint, that the mortgage company had fraudulently suppressed material facts, had intentionally made false and defamatory statements, and had intentionally interfered with contractual relations between the Fords and Walls. The jury found that Colonial, in its dealings with Walls and the Fords, breached its contract under circumstances which constituted fraud.
 
 
 24
 The former fifth circuit, in an opinion binding on this court, has recognized that Alabama public policy prohibits insuring against intentional wrongs. In St. Paul Ins. Cos. v. Talladega Nursing Home, Inc.,[9] the court considered the liability of an insurance company under Alabama law to indemnify and defend the insured in civil actions alleging slander, interference with business relations, and violations of the federal antitrust laws. In considering whether the insurance company had a duty to defend, the court summarized Alabama law as follows:
 
 
 25
 In Fidelity-Phenix Fire Ins. Co. v. Murphy, 226 Ala 226, 146 So. 387 (1933), the Alabama Supreme Court, in the context of the willful and deliberate destruction of the insured's ship by the insured, held void as against public policy any insurance coverage protecting against "loss which [the insured] may purposely and willfully create." Id. at 230, 146 So. at 390. In Pruet v. Dugger-Holmes & Assoc., 276 Ala. 403, 162 So.2d 613 (1964), this doctrine was extended to include a suit for intentional trespass. These two cases have been interpreted to hold that all contracts insuring against loss from intentional wrongs are void in Alabama as against public policy. See Industrial Sugars, Inc. v. Standard Accident Ins. Co., 338 F.2d 673, 676 (CA7, 1964); Thomason v. United States Fidelity & Guaranty Co., 248 F.2d 417, 420 (CA5, 1957) (Rives, J., dissenting).[10]
 
 
 26
 Based on its analysis of state law, the court reasoned that the crucial question under Alabama law was "whether the acts alleged in the underlying complaint constitute intentional wrongs."[11]
 
 
 27
 Alabama law, as the court in St. Paul noted, defines intentional wrongs in the context of insurance, as "including both intentionally causing injury and 'intentionally doing some act which reasonable and ordinary prudence' would indicate likely to result in injury."[12] The Fords in their complaint alleged intentional acts committed by Colonial in an effort to rid itself of a note and mortgage it realized it could not sell in the secondary market. In the instant case, as in St. Paul, the elements of each of the underlying causes of action include either an intent to injure or the commission of acts reasonably likely to injure. We, therefore, hold that under Alabama law, the umbrella carriers had no duty to indemnify Colonial for intentional acts committed in the course of its negotiations with the Fords.
 
 
 28
 Neither can Colonial argue that the umbrella policies provide coverage to Colonial for its liability in the underlying lawsuits because the policies cover claims against the insured for "mental anguish" or "humiliation."[13] Even if the umbrella carrier agreed to indemnify Colonial for intentional acts committed, "where public policy forbids a particular insurance contract, 'public policy [also] forbids the accomplishment of the result by an estoppel.' "[14]
 
 
 29
 Finally, as to the umbrella carrier's liability for injury arising from Colonial's rendering of "professional services," the umbrella policies' professional liability exclusions simply are not relevant to determining whether Colonial's intentional acts of fraud against the Fords are insurable. As an instructive article on professional liability from the Practising Law Institute indicates, "[a] common--and easily anticipated--coverage problem arises when there are allegations of 'wilful' activity by the insured. Pursuant to statute ..., public policy or both, carriers are precluded from covering such acts."[15]
 
 
 30
 The Alabama courts also have recognized this distinction between an action alleging intentional acts and a malpractice action. In Correll v. Fireman's Fund Insurance Companies,[16] the court considered the coverage of a life underwriter's professional liability policy. There, the professional liability was explicitly limited to claims made "by reason of any negligent act, error or omission committed or alleged to have been committed by the Insured."[17] Because the complaint there alleged only "intentional acts of forgery, embezzlement, intentional or wanton conversion, breach of contract, tortious bad faith, breach of contract and outrageous conduct," the court held that the professional liability policy did not insure against the acts alleged.[18] Similarly, here, the professional liability exclusion does not determine the umbrella carrier's liability for injury resulting from Colonial's intentional acts. Rather, Alabama law and public policy dictate that the carrier has no duty to its insured to indemnify Colonial for intentional acts.
 
 III. CONCLUSION
 
 31
 For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of International Insurance Company and U.S. Fire Insurance Company, the umbrella carriers.
 
 HATCHETT, Circuit Judge, concurring specially:
 
 32
 The umbrella carriers argued before the district court that they owed no duty to Colonial concerning the underlying lawsuit brought against Colonial by the Fords because of the "professional service" liability exclusions contained in the umbrella policies. The district court agreed, and upon Colonial's appeal to this court, the umbrella carriers again asserted that as a result of the "professional service" exclusions, they owed no duty to indemnify Colonial. The majority disposes of this case based on an argument neither the umbrella carriers, nor the district court considered. Although agreeing with the result the majority reaches, I would confine my analysis to the issues and arguments the district court ruled on and the parties presented.
 
 
 33
 Colonial contends that whether the activities for which it was found liable in the underlying litigation were "professional services" rendered for others presents an issue of material fact. According to Colonial, under Alabama law, what constitutes a "professional service" is a question of fact. To support this argument, Colonial relies heavily on the case of United States Fidelity and Guaranty Co. v. Armstrong, 479 So.2d 1164 (Ala.1985). In Armstrong, a declaratory judgment action was brought in an effort to determine whether an insurer owed its insured, an engineering company, coverage for liability which the insured might incur in a pending lawsuit. At the time the declaratory judgment action was decided, the underlying lawsuit was still pending; thus, the activity which led to liability had not been factually established. The court held that the insurer had a duty to defend, in light of the claim for damages due to nonprofessional services, but the court noted that the insurer would not be required to indemnify for damages not caused by professional services.
 
 
 34
 The Armstrong court was not in a position to decide, as a matter of law, whether an activity constituted a "professional service" because the particular activity out of which the liability arose was unidentified due to the posture of the case. In this case, however, the facts had been resolved because the underlying lawsuits had been tried; the activities of Colonial which ultimately resulted in its liability had been identified. Since the facts had been established beyond dispute, the only remaining issue, whether the acts rendering Colonial liable were "professional services," was a matter of law. See Alpha Therapeutic Corp. v. St. Paul Fire and Marine Ins. Co., 890 F.2d 368 (11th Cir.1989).
 
 
 35
 The district court determined that Colonial's activities constituted "professional services" as a matter of law:
 
 
 36
 In order to determine what is a 'professional service' in the present case, this court must examine the definition set forth in the policy. The policy states that the exclusion applies to 'any professional liability arising out of the insured's profession as a mortgage company.' It further defines 'professional liability' as liability 'arising out of the insured's profession.' There is no question that Colonial was in the business of making mortgage loans, and that liability arose in the underlying cases out of the act of making a mortgage loan. The exclusion further states that professional liability which arises out of the insured's rendering or failure to render such services by any employee or any person for whom the insured is legally liable is not covered. It cannot be disputed that the Walls and Ford litigation arose out of actions and decisions of Colonial's employees, agents, and those for whom Colonial was responsible. The circumstances involved in the Walls and Ford litigation fit squarely within the definition set forth in the policy's professional liability exclusion.
 
 
 37
 Colonial argues that the district court erred when it interpreted "professional services" to mean any activity relating to Colonial's business. Colonial urges that the court should have considered the affidavit of Paul Miles, an independent agent who served as Colonial's risk manager, which states that Colonial expected that the policies it had with the umbrella carriers would cover the type of liability it faced as a result of the Fords' lawsuit.
 
 
 38
 When interpreting the meaning of any particular policy provision, unambiguous exclusions must be enforced as written. Altiere v. Blue Cross and Blue Shield of Alabama, 551 So.2d 290 (Ala.1989). If the language of a policy provision is not ambiguous, the court will not consider the reasonable expectations a party to the contract had concerning the provision's meaning. Wallace v. Auto-Owners Ins. Co., 421 So.2d 131, 133 (Ala.Civ.App.1982). Colonial's policies with the umbrella carriers expressly define Colonial's profession as "a mortgage company," and expressly exclude coverage for liability arising out of Colonial's profession and caused by the rendering or failure to render professional service for others. The issuing of letters of commitment and the representations made concerning its loans are central to the profession or business of serving others as a mortgage company. Colonial's liability clearly arose out of actions it undertook as a mortgage company performing its services for others.
 
 
 39
 Colonial also contends that the affidavit of Walter Sexton, who performed the underwriting functions leading to the issuance of the umbrella policies, creates a latent ambiguity in the policy. Sexton stated that the umbrella carriers believed that they owed coverage to Colonial under the policies for the losses Colonial sustained as a result of the Ford verdict, assuming such losses were due to liability for humiliation and mental anguish.
 
 
 40
 A latent ambiguity creates a material issue of fact making summary judgment improper. See Hashwani v. Barbar, 822 F.2d 1038, 1040 (11th Cir.1987) (per curiam) (applying Florida law). "An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990) (citing Black's Law Dictionary (5th ed. 1979) and Medical Clinic Board of the City of Birmingham-Crestwood v. Smelley, 408 So.2d 1203 (Ala.1981)).
 
 
 41
 In Thomas, an insurance policy provided coverage for certain dependents of the insured, including children "attending school on a full-time basis." 566 So.2d at 736. The insurer had denied benefits in connection with the death of the insured's daughter. The daughter, who had enrolled in July, 1984, in a 1,200-hour work-study course in cosmetology and had paid full tuition, became disabled and could not attend school after August, 1985, due to cancer; she died of cancer in March, 1987. The insured argued that the words "attending school on a full-time basis," which were not defined in the policy, were ambiguous and that her daughter fell within the meaning of the policy, even though she had not attended classes for approximately eighteen months preceding her death. The insurer argued that no fact question existed for jury resolution. According to the insurer, the words of the policy were clear and the undisputed evidence showed that the daughter was not attending school on a full-time basis.
 
 
 42
 The trial court concluded that the words "attending school on a full-time basis" were ambiguous under the circumstances. It allowed the parties to present evidence concerning the meaning of the provision and instructed the jury to determine whether the daughter was a "dependent" within the meaning of the policy at the time of her death. The Alabama Supreme Court affirmed. It noted that while the words were not patently ambiguous, the policy language suffered from a latent ambiguity. Cf. Cathbake Investment Co., Inc. v. Fisk Electric Co., 700 F.2d 654 (11th Cir.1983) (applying Alabama law) (latent ambiguity exists in contract provision mentioning "inter-company accounts" without defining the term, and extrinsic evidence is admissible to elucidate the term's meaning).
 
 
 43
 Unlike the provisions in question in Thomas and Cathbake, the professional liability exclusions in Colonial's policy are unambiguous. In Colonial's policy, Colonial's profession is expressly stated to be "a mortgage company." Professional services, in this context, necessarily mean services Colonial provided as a mortgage company. Even though Alabama law recognizes that parol evidence is admissible when a contract contains a latent ambiguity, the "latent ambiguity" doctrine is not to be applied when the contract is not ambiguous and the terms clearly delineate the parties' rights and obligations. See Hashwani, 822 F.2d at 1040.Even where a party seeks to prove a latent ambiguity, the interpretation urged by that party must be reasonable. No latent ambiguity exists unless the contract is actually susceptible to the meaning contended for by a party. In seeking to prove a latent ambiguity, a party must attempt to resolve an actual ambiguity, not create one.
 
 
 44
 Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1362 (11th Cir.1988) (Clark, J.) (citations omitted), cert. denied, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989).
 
 
 45
 Finally, Colonial contends that even if it was proper for the district court to determine whether Colonial's activities leading to liability were "professional services," the district court failed to read the professional liability exclusions as narrowly as possible, as Alabama law requires. See Sullivan v. State Farm Mutual Automobile Ins. Co., 513 So.2d 992 (Ala.1987). Colonial points to the policy's general provisions which provide coverage for liability imposed upon Colonial by law as the result of mental anguish or injury and humiliation suffered by a third party. From these general provisions, Colonial contends that to the extent the professional liability exclusions contradict the general bodily and personal injury provisions, the policy is ambiguous, and the court should have considered extrinsic evidence in determining the scope of the policy.
 
 
 46
 It is incorrect to assume that because the coverage sections of the umbrella policies provide coverage for loss due to mental anguish and humiliation, the exclusions should be interpreted so as not to apply to that coverage. The essential purpose of an exclusion is to limit the scope of coverage granted in the coverage section of the policy. By definition, any exclusion is in direct conflict with the coverage section of the policy, but this conflict does not make the policy ambiguous. Since the exclusions do not create ambiguities in the policy, the district court correctly refused to consider extrinsic evidence. Green v. Merrill, 308 So.2d 702 (Ala.1975).
 
 
 47
 For the reasons stated, I concur with the result the majority reaches.
 
 
 
 *
 Honorable Robert F. Peckham, Senior U.S. District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Memorandum Opinion, Civil Action No. 89-D-100-E, at 13-14 (March 26, 1990)
 
 
 [2]
 The umbrella policies state generally:
 The company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract, for:
 (a) Bodily Injury Liability,
 (b) Personal Injury Liability,
 (c) Property Damage Liability, or
 (d) Advertising Liability,
 arising out of an occurrence.
 "Bodily injury" means:
 (a) sickness, disease, disability, shock, mental anguish and mental injury including death at any time resulting therefrom; ...
 
 
 [3]
 Fed.R.Civ.P. 56(c)
 
 
 [4]
 Livernois v. Medical Disposables, Inc., 837 F.2d 1018, 1021-22 (11th Cir.1988)
 
 
 [5]
 Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir.1987)
 
 
 [6]
 Id
 
 
 [7]
 Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [8]
 Walls suit against Colonial settled after judgment for an amount within the primary coverage limits, and American, the primary carrier, paid the full amount. Because the verdict rendered in favor of the Fords was in excess of the primary coverage limits, it is this judgment from which Colonial seeks indemnity from the umbrella carriers
 
 
 [9]
 606 F.2d 631 (5th Cir.1979)
 
 
 [10]
 Id. at 633. In Burnham Shoes, Inc. v. West American Ins. Co., 504 So.2d 238, 241 n. 1 (Ala.1987), the Alabama Supreme Court, referring to the former fifth circuit's decision in St. Paul, stated:
 We express no opinion here as to the correctness of the Fifth Circuit's conclusion that insurance contracts in which the insurer agrees to indemnify its insured for intentional acts violate the public policy of this state.
 We adhere to the fifth circuit's statement of Alabama law as binding on this court.
 
 
 [11]
 Id. at 634
 
 
 [12]
 Id. (quoting Hartford Fire Ins. Co. v. Blakeney, 340 So.2d 754, 756 (Ala.1976); accord Transit Casualty Co. v. Snow, 584 F.2d 97, 99 (5th Cir.1978))
 
 
 [13]
 As set forth above, see supra note 2, the policy insures against liability for bodily injury or personal injury. "Bodily injury" includes "mental anguish." "Personal injury" means injury, "such as but not limited to libel, slander, defamation of character, ... or humiliation...."
 
 
 [14]
 St. Paul, 606 F.2d at 634 n. 2 (quoting Northwestern Nat'l Casualty Co. v. McNulty, 307 F.2d 432, 442 (5th Cir.1962))
 
 
 [15]
 "Coverage Aspects of Claims Against Professionals: Plaintiff's Perspective," 303 PLI/Lit 39 (May 1, 1986) (PLI Order No. H4-4992)
 
 
 [16]
 505 So.2d 295 (Ala.1986)
 
 
 [17]
 Id
 
 
 [18]
 Id. at 297; see also Lawson v. Cagle, 504 So.2d 226 (Ala.1987) (emphasizing distinction between legal malpractice action and fraud action)