## ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff,

v.

## Cecil B. JACOBSON, Jr., M.D., and Reproductive Genetics Center, Ltd., Defendants.

### Civ. A. No. 92 CV 1656.

United States District Court, E.D. Virginia, Alexandria Division.

July 9, 1993.

---

Daniel W. Cotter, Fairfax, VA, for plaintiff.

Thomas Richard Nedrich, Nicholas D. Vlissides, Falls Church, VA, for defendants.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

#### I.

This insurance coverage dispute grows out of a physician's criminal misconduct and the tragic consequences of that misconduct. Plaintiff, St. Paul Marine and Fire Insurance Company ("St. Paul") initiated this declaratory judgment action against defendants Dr. Cecil Jacobson, Jr. ("Jacobson") and Reproductive Genetics Center, Ltd ("RGC"), to obtain rescission of a professional liability policy issued to the defendants or, in the alternative, for declaratory judgment relieving St. Paul of its obligation to defend and indemnify Jacobson and RGC in connection with civil suits filed against them by former patients. St. Paul bases its prayer for rescission and declaratory relief on the alleged misconduct of Jacobson, a fertility specialist,

in using his own sperm in the artificial insemination of his patients. This matter is now before the Court on the parties' cross-motions for summary judgment. Because no material facts are in dispute, summary disposition is appropriate.

Summary judgment is especially appropriate in this case because the construction of insurance contracts is a legal question well suited for resolution by the court. *John Deere Ins. Co. v. Shamrock Indus. Inc.*, 929 F.2d 413, 417 (8th Cir.1991) ("the interpretation and construction of insurance policies is a matter of law, and therefore, such cases are particularly amenable to summary judgement"); *Morrisville Water & Light Dept. v. United States Fidelity and Guaranty Co.*, 775 F.Supp. 718, 722–23 (D.Vt.1991) (summary judgment appropriate "because the construction of an insurance policy is a question of law, not fact"). Given this, and for the reasons set forth below, summary judgment is granted in favor of defendants Jacobson and RGC.

#### II.

At the center of this insurance coverage dispute is the professional liability insurance policy issued by St. Paul, a Minnesota insurance company, to Jacobson, a Utah doctor practicing in Virginia, and RGC, the Virginia fertility clinic owned and operated by Jacobson. This policy covers claims arising from "the providing or withholding of professional services." According to its terms, the policy:

"provides protection against professional liability claims which might be brought against you in your practice as a physician or surgeon."

In addition, the policy obligates St. Paul to:

"defend any suit brought against you for damages covered by this agreement ... even if the suit is groundless or fraudulent."

St. Paul initially issued the policy to Jacobson in April 1976, extending coverage in April 1979 to include RGC. The policy was in effect at all times relevant to this action. Coverage was subject to periodic review by St. Paul, and, as a condition of renewal, St. Paul required Jacobson to submit signed in-

surance applications on behalf of himself and RGC. In 1986, Jacobson submitted an insurance application in accordance with St. Paul's renewal requirements. This application requested Jacobson to answer the following question:

> 39. Do you have knowledge of any pending claims or activities (including requests for medical records) that might give rise to a claim in the future?

In response, Jacobson answered "yes," and disclosed that he was a named defendant in one pending lawsuit.[1] But Jacobson did not disclose that he was engaged in an ongoing fraud in connection with his fertility practice—i.e., that he was inseminating patients with his own semen, rather than, as he represented to patients, with semen from anonymous donors or the patients' husbands.

Subsequently, a federal grand jury returned a fifty-three count indictment against Jacobson, charging him with violations of federal law including, *inter alia*, mail fraud, wire fraud, travel fraud, and perjury. These charges stemmed in part from Jacobson's *fraudulent insemination practices*.[2] Following a trial in February, 1992, a jury convicted Jacobson on these fifty-three counts. Jacobson was thereafter sentenced to sixty months in prison, and his appeal of the conviction is currently pending before the United States Court of Appeals for the Fourth Circuit.

The instant coverage dispute arises from various civil actions filed against Jacobson and RGC following this criminal prosecution.[3]

To date, five lawsuits have been filed. Each action seeks tort damages and child support based on Jacobson's fraudulent and unauthorized use of his own semen in connection with the artificial insemination of the female patients named as plaintiffs.[3] Faced with these lawsuits, Jacobson and RGC have called upon St. Paul to defend and indemnify them against these civil claims (and any others that may arise in the future) under the professional liability policy. St. Paul has refused this request. It disagrees that there is any duty to defend or indemnify in the circumstances. To resolve this dispute, and because it anticipates that additional claims may be filed in the future, St. Paul has filed this action for declaratory judgment pursuant to 28 U.S.C. § 2201. At present, however, St. Paul is defending Jacobson and RGC in the underlying actions pursuant to a reservation of rights.

### III.

■ Analysis properly begins with the threshold determination of the validity of St. Paul's rescission claim. Specifically, St. Paul contends that Jacobson's 1986 renewal application contained materially false representations that warrant rescission of the policy. If valid, this claim would be case dispositive and render moot the remaining coverage issues.

■ Under Virginia law, an insurer may rescind an insurance policy because of misrepresentations in the insurance application

---

1. This lawsuit, styled *Dolan v. Jacobson*, is unrelated to the issues in this case.

2. Jacobson was charged with more than fraudulently inseminating his patients with his own sperm. He was also indicted on charges arising from his involvement in a scheme in which he deceived patients into believing that they were pregnant and then subsequently informed them that they had suffered miscarriages.

3. These civil actions are styled as follows: (i) *John James and Mary James v. Cecil B. Jacobson, Jr., M.D., et al.*, Civ. No. 92–852–A, pending in the United States District Court for the Eastern District of Virginia; (ii) *John Stone and Mary Stone v. Cecil B. Jacobson, Jr., M.D., and Reproductive Genetics Center, Ltd.*, at Law No. 117387, pending in the Circuit Court for Fairfax County, Virginia; (iii) *Mary Green, John Green and infant*

*Green v. Dr. Cecil B. Jacobson, et al.*, at Law No. 119407, pending in the Circuit Court for Fairfax County, Virginia; (iv) *Mary Smith, John Smith and infant Smith v. Dr. Cecil B. Jacobson, et al.*, at Law No. 119408, pending in the Circuit Court for Fairfax County, Virginia; (v) *Mary White, John White, and infant White v. Dr. Cecil B. Jacobson, et al.*, at Law No. 119409, pending in the Circuit Court for Fairfax County, Virginia.

These lawsuits allege that Jacobson committed a variety of torts including, *inter alia*, fraud, medical malpractice, infliction of emotional distress, battery, and the tort of "outrage." In addition, as noted, several of these complaints also seek recovery for child support.

St. Paul has also been advised of a sixth potential lawsuit, as a notice of claim pursuant to *Va.Code* § 8.01–581.1 *et seq.* was filed on January 11, 1993 by John Adams, Mary Adams, and their three minor children.

only in certain circumstances.[4] *Va.Code* § 38.2–309 provides in pertinent part:

No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance *unless it is clearly proven that such an answer or statement was material to the risk when assumed and was untrue.* (emphasis added)

Rescission of the St. Paul policy is therefore appropriate only if St. Paul clearly proves that an answer or statement in Jacobson's 1986 renewal application for insurance was both (i) material to the risk assumed; and (ii) untrue. *See Mutual of Omaha Ins. Co. v. Dingus,* 219 Va. 706, 250 S.E.2d 352, 355 (1979); *Utica Mutual Ins. Co. v. National Indemnity Co.,* 210 Va. 769, 173 S.E.2d 855, 858 (1970). In light of the undisputed facts presented here, St. Paul cannot make such a showing.

■ In essence, St. Paul's rescission claim fails because it cannot "clearly prove[ ]" the second prong of the well-settled test for rescission—i.e., that Jacobson's response to Question 39 represented an "untrue statement." Question 39 asked whether or not Jacobson had knowledge of "any pending claims or activities (including request for medical records) that might give rise to a claim in the future." Since it is undisputed that Jacobson answered "yes" to this question, and then noted the caption and status of a pending lawsuit against him, he cannot be deemed to have made an *affirmative* misstatement. Nor does Jacobson's *non-disclosure* of his fraudulent activity amount to an untrue statement. Significantly, the "[t]erms of a question in an application for insurance must be interpreted as the ordinary person standing in the shoes of the insured would understand them." *MFA Mutual Insurance Co. v. Lusby,* 295 F.Supp. 660, 667 (W.D.Va.

1969). Thus, only if Question 39, as understood by the ordinary person, clearly required Jacobson to provide information concerning his fraudulent insemination of his patients would the omission constitute a misrepresentation.[5] Fairly read, it did not do so. Fairly read, Question 39 did not require Jacobson to disclose knowledge of any and all of his "activities" that might conceivably spawn future legal claims. Instead, Question 39 asked about "pending" claims, which Jacobson answered accurately. And it also asked about "activities (including requests for medical records) that might give rise to a claim in the future," which Jacobson answered by saying, in effect, "none." This, too, was an accurate answer if, as an ordinary person would reasonably conclude, the "activities" referred to in the question were not those of Jacobson, but of third parties. The conclusion that Question 39's plain language addresses "activities" of third parties, not the insured, finds further support in the example given in the question, namely a request for medical records by a patient or someone on the patient's behalf. Common sense, too, dictates this reading of the question. If Question 39 were directed to the insured's activities, then prudence might dictate listing every patient and treatment (or at least every unsuccessful treatment), as conceivably, each might be an activity "that might give rise to a claim in the future." To omit any would invite a coverage dispute on virtually every claim, as the insurer would routinely deny coverage where the activity giving rise to the claim was not listed. This is a nonsense result. It follows therefore that, properly understood by the ordinary person, Question 39 seeks information on the "activities" that might flag a potential claim. So read and understood, Question 39 was properly answered by Jacobson. According-

---

4. Virginia law governs this case. Under the well-settled rule in *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), federal courts must apply the choice of law rules of the forum state in diversity cases. Absent an express contract provision to the contrary, disputes in Virginia concerning the interpretation of a contract are governed by the law of the place where the contract was made. *C.I.T. Corp. v. Guy,* 170 Va. 16, 195 S.E. 659 (1938). Since the St. Paul policy at issue was made in Virginia and contains no express choice of law

provisions, Virginia law applies to its construction.

5. *Cf. Insurance Co. of North America, Inc. v. U.S. Gypsum Co.,* 870 F.2d 148, 153 (4th Cir.1989) (citations omitted) ("Virginia law is clear that an insured 'is bound only to disclose such matters as may be inquired about ... or unless it is made imperative upon him by some condition of the policy.' ").

ly, the record does not provide the requisite clear proof of a material misrepresentation, and the rescission claim accordingly fails.[6]

## IV.

■ The next inquiry, given the failure of the rescission claim, is whether the policy requires St. Paul to defend and indemnify Jacobson and RGC against the various civil actions filed against them by their former patients. Contrary to defendants' arguments, the truth of the allegations in the underlying complaints need not be established for resolution of this dispute. Rather, under well established Virginia law, St. Paul's duty to defend is determined solely by examining whether the complaint's allegations fall within the scope of the policy's coverage. *See Travelers Indemnity Co. v. Obenshain,* 219 Va. 44, 46, 245 S.E.2d 247, 249 (1978); *American & Foreign Ins. Co. v. Church Schools in the Diocese,* 645 F.Supp. 628, 631 (E.D.Va.1986). As long as the complaint's allegations present potentially covered claims, St. Paul must defend these claims pursuant to the policy, even though they may ultimately fail or prove to be groundless. *Id.* 219 Va. at 46, 245 S.E.2d 247. And given the allegations in the underlying complaints at issue here, St. Paul would also have a duty to indemnify the defendants should plaintiffs in these civil actions prevail. Thus, appropriately presented for resolution here on summary judgment are two issues: (i) whether Jacobson's alleged misconduct in inseminating patients with his own sperm falls within the policy's "professional" liability coverage; and (ii) if so, whether public policy nonetheless precludes coverage because of the intentional nature of Jacobson's actions.

### A. Coverage under St. Paul's Professional Liability Policy

■ The policy expressly covers claims arising from Jacobson's provision of "professional services." The pertinent portions of the policy provide, as follows:

Individual coverage. Your professional liability protection covers you for damages resulting from:

1. Your *providing or withholding of professional services.*

\* \* \* \* \* \*

Organization coverage. Your organization is also protected for damages *resulting from the providing or withholding of professional services* by anyone whose acts it's legally responsible for. (emphasis added)

The parties hotly dispute whether Jacobson's fraudulent use of his own semen to inseminate his patients amounts to "professional services." Jacobson and RGC argue that the harms alleged in the underlying civil actions clearly flow from Jacobson's provision of medical care and services to couples seeking to have children. St. Paul, in response, contends that Jacobson's actions in producing sperm and using it in the artificial insemination of his patients does not qualify as bona fide "professional services."

■ To be sure, as St. Paul correctly notes, a professional liability policy does not cover all claims arising from a doctor's actions simply by virtue of his professional status. To determine whether an insured doctor has engaged in a "professional service," it is well established that courts must look to the nature of the insured's act or

---

6. In this regard, St. Paul's reliance on *Time Ins. Co. v. Bishop,* 245 Va. 48, 425 S.E.2d 489 (1993), *Parker v. Prudential Insurance Co.,* 900 F.2d 772 (4th Cir.1990), and *Mutual of Omaha Ins. Co. v. Echols,* 207 Va. 949, 154 S.E.2d 169 (1967), is misplaced. As St. Paul correctly notes, the courts in these cases rescinded insurance policies based on material misrepresentations made on the policy applications. Unlike Jacobson, however, the insureds in both *Bishop* and *Prudential,* made affirmative misstatements by flatly denying that they had used alcohol and tobacco, respectively, in response to direct questions about past use of these substances. Only in *Echols* did the

court face a situation where the rescission was based on the insured's failure to disclose full and complete information. Yet, *Echols,* too, is distinguishable. There, the policy application contained a precise and unambiguous question that requested information about "physical conditions or injuries" and "symptoms of ill health." *Echols,* 154 S.E.2d at 170. The *Echols* court held that the insured's failure to disclose information relating to fainting spells amounted to an untrue statement. By contrast, Question 39 does not unambiguously ask for a listing of all of Jacobson's "activities" that might lead to potential claims. As such, *Echols* is inapposite.

conduct, not to the insured's title.[7] Equally well established is that an insured's act, to constitute a "professional service," "must be such as exacts the use or application of special learning or attainments of some kind." *Quintana, supra,* 419 N.W.2d at 62 (quoting *Marx, supra,* 157 N.W.2d at 871–72). Relying on this definition, St. Paul argues that Jacobson's actions in producing sperm, i.e., masturbation, and acting as a sperm donor for the plaintiffs in the underlying actions do not constitute "professional services." According to St. Paul, these actions clearly do not arise "out of a vocation, calling, occupation, or employment involving specialized

knowledge, labor, or skill." *Niedzielski, supra,* 589 A.2d at 131 (quoting *Marx, supra,* 157 N.W.2d at 872). This is surely correct; the notion that masturbation to produce semen requires the application of "special learning or attainments" is ludicrous and must be dismissed. But this does not end the analysis, for by focusing on the production of semen, St. Paul has missed the mark. The "professional service" at issue is not Jacobson's production of sperm. It is, instead, the fraudulent use of his sperm to inseminate his patients. The underlying civil actions make this unmistakably clear.[8] And,

---

**7.** *See Prior v. S.C. Medical Malpractice Liability Ins. Joint Underwriting Assn.,* 305 S.C. 247, 407 S.E.2d 655, 657 (Ct.App.1991) ("[i]n examining the complaint, we must look beyond the labels describing the acts, to the acts themselves which form the basis of the claim against the insured"); *Niedzielski v. St. Paul Fire & Marine Ins. Co.,* 134 N.H. 141, 589 A.2d 130, 131–32 (1991) (courts look to "the nature of the act performed, rather than the title or professional character of the actor"); *St. Paul Ins. Co. v. Cromeans,* 771 F.Supp. 349, 353–54 (N.D.Ala.1991) (same); *Standard Fire Ins. Co. v. Blakeslee,* 54 Wash.App. 1, 771 P.2d 1172, 1176 (1989) (same); *Hirst v. St. Paul Fire and Marine Ins. Co.,* 106 Idaho 792, 683 P.2d 440, 443 (Ct.App.1984); *Harad v. Aetna Cas. & Surety Co.,* 839 F.2d 979, 984 (3rd Cir. 1988) (same); *St. Paul Fire & Marine Ins. Co. v. Quintana,* 165 Mich.App. 719, 419 N.W.2d 60, 62 (1988) (same); *Washington Ins. Guar. Ass'n v. Hicks,* 49 Wash.App. 623, 744 P.2d 625, 627 (1987) (same); *Marx v. Hartford Acc. and Indemnity Co.,* 183 Neb. 12, 157 N.W.2d 870, 872 (1968) (same).

The Nebraska Supreme Court, in its opinion in *Marx v. Hartford Accident & Indemnity Co., supra,* announced the definition of "professional services" that has been widely adopted and used by courts in determining the scope of coverage of professional liability policies. As the *Marx* court stated:

The insurer's liability is thus limited to the performing or rendering of 'professional' acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind.... A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual [citations omitted]. In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title of the character of the party performing the act, but to the act itself.

157 N.W.2d at 871–872.

**8.** For example, the James complaint alleges, in pertinent part:

13. Unbeknownst to plaintiffs, Dr. Jacobson, consistent with his pattern and practice of fraudulently using his own sperm with his own patients, *used* his own semen rather than or in addition to the semen of the husband, John James, to inseminate Mary James. Jacobson never intended to follow the protocol offered to and agreed upon by his patients and never advised plaintiffs that he used his own semen in the procedure rather than the husband's semen and, in fact, acted in a manner intended to foster a belief that the semen he *used to inseminate Mary James* was solely produced by John James. (emphasis added).

In addition, the Smith complaint provides, in pertinent part:

5. Dr. Jacobson further represented to the adult plaintiffs that he would choose a donor who matched the physical characteristics of the patients so that any child born of such insemination would bear a physical resemblance to his or her parents. The adult patients requested that the donor be of their faith, Jewish, and Dr. Jacobson assured them the donor would be Jewish.

6. Notwithstanding the representations and assurances of Dr. Jacobson to the contrary, the adult plaintiffs have learned that the donor of the sperm for insemination was not an anonymous donor, but was in fact Dr. Jacobson and that the patient-plaintiffs were not anonymous to the donor, but were well known to the donor, and that their child, the minor plaintiff, is not the child of an anonymous donor, but of Dr. Jacobson himself. The child bears no physical resemblance to the plaintiff parents, but strongly resembles Dr. Jacobson. The child was not born of a Jewish father.

As the complaints make clear, the alleged harms flow from Jacobson's successful insemination of these patients and the resulting birth of children sharing Jacobson's genes and characteristics, not those of the requested and expected donors.

unlike his masturbation, Jacobson's fraudulent artificial insemination of his patients with his own sperm involved the provision of professional, medical services requiring special skill and knowledge.[9] In this case, it is the operation itself, i.e., the insemination (and, ironically, its success), that is the proximate cause of the harms alleged in the underlying civil actions. As a result, the St. Paul policy extends coverage to claims arising from Jacobson's misconduct.

Indeed, the present case is not significantly different from a hypothetical case, raised in oral argument, in which a doctor represents that she will provide medicine X to a patient, but instead, administers a different and potentially harmful drug, medicine Y, which the doctor believes, perhaps mistakenly, would be beneficial to the patient. In this hypothetical, as in the case at bar, a doctor has lied to patients about the true nature of a substance to be introduced into the patients' bodies. And, in both cases, the doctor provides professional medical services to the patients by using his or her specialized knowledge and skill to select and introduce the substance into the patients' bodies. Significantly, counsel for St. Paul conceded at oral argument the policy in issue would likely cover this hypothetical case. The same result would obtain here, given that the hypothetical is essentially indistinguishable from the case at bar.

### B. Public Policy Exclusion for Intentional Misconduct

■ The final obstacle to coverage is the public policy rule precluding an individual from insuring against his own intentional misconduct. St. Paul argues that this obstacle cannot be overcome. Defendants Jacobson and RGC argue, however, that the policy considerations underlying this public policy rule are inapplicable here, and that, in fact, countervailing policy considerations militate in favor of coverage. In light of the undisputed facts at bar, defendants' arguments prevail.

■ To be sure, public policy generally bars coverage for an insured's intentional wrongdoing or criminal misconduct.[10] Un-

---

9. *See St. Paul Fire & Marine Ins. Co. v. Asbury,* 149 Ariz. 565, 720 P.2d 540 (Ct.App.1986) (doctor's alleged intentional and improper manipulations during gynecological examinations covered by professional liability policy because intentional tort committed "in the course of and as an inseparable part of the providing of professional services").

Decisions cited by St. Paul involving sexual misconduct by medical professionals during medical examinations are inapposite here. These decisions simply stand for the proposition that where a medical professional's wrongful acts bear no direct relation to the medical service provided, these acts cannot be deemed "professional services" covered by a professional liability policy. *See e.g., Cromeans, supra,* 771 F.Supp. 349 (sexual misconduct during medical examination not covered by professional liability policy); *Quintana, supra,* 419 N.W.2d 60 (medical technician's sexual assault on patient not covered by professional liability policy); *Niedzielski, supra,* 589 A.2d 130 (sexual assault by dentist on patient during dental examination not covered); *Blakeslee, supra,* 54 Wash.App. 1, 771 P.2d 1172 (1989) (same); *Hirst, supra,* 106 Idaho 792, 683 P.2d 440 (Ct.App.1984) (sexual assault by doctor during medical examination not covered). The instant case is fundamentally different. Here, the wrongful acts in question, *i.e.,* the fraudulent inseminations of patients, are more than directly related to the medical service provided; they are the medical service provided.

Indeed, courts have uniformly held that sexual abuse and misconduct by *psychiatrists* are covered by professional liability policies because such conduct invariably involves mishandling of the "transference" phenomenon that arises in the course of psychiatric treatment of patients. As such, courts have held that manipulation of this transference phenomenon by psychiatrists, and the sexual misconduct resulting therefrom, is inextricably intertwined with the professional services provided. *See e.g., St. Paul Fire & Marine Ins. Co. v. Love,* 447 N.W.2d 5 (Minn.Ct.App. 1989); *L.L. v. Medical Protective Co.,* 122 Wis.2d 455, 362 N.W.2d 174 (Ct.App.1984); *Vigilant Ins. Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382 (1982); *Zipkin v. Freeman,* 436 S.W.2d 753 (Mo.1968). So, too, is the medical technique of insemination inextricably intertwined with Jacobson's fraud.

10. *See e.g., Fedele v. National Liberty Ins. Co.,* 184 Va. 528, 35 S.E.2d 766 (1945) (elementary principles of public policy deny recovery to insured who fraudulently set fire to property covered by policy); *Cunningham & Walsh, Inc. v. Atlantic Mut. Ins. Co.,* 88 Or.App. 251, 744 P.2d 1317, 1319–20 (Ct.App.1987) ("to provide coverage for fraud would violate public policy"); *Wedge Products v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74, 76 (1987) ("public policy is contrary to insurance against intentional torts"); *Ranger Ins. Co. v. Bal Harbour Club, Inc.,* 549 So.2d 1005, 1007 (Fla.1989) ("it is

derlying this public policy coverage bar is the concern that permitting coverage in certain circumstances will encourage insureds to engage in intentional misconduct. Barring coverage in these circumstances discourages insureds from intentionally harming others, as intentional wrongdoers cannot then rely on the availability of insurance to shield them from the civil consequences of their misconduct. Similarly, the public policy coverage exclusion bars insureds from recovering for self-inflicted wounds, thereby appropriately preventing insureds from enjoying the fruits of their wrongful acts. *See e.g., Hussar v. Girard Life Ins. Co.,* 252 So.2d 374 (Fla.Dist. Ct.App.1971). Thus, not only does the public policy exclusion deprive intentional wrongdoers of the economic benefits arising from coverage of their wrongful acts, it reaffirms the "moral principle [that] no person should be permitted to allege his own turpitude as a ground for recovery." *Ambassador Insurance Co. v. Montes,* 76 N.J. 477, 482, 388 A.2d 603, 605 (1978).

Virginia adheres to this general principle of coverage exclusion for intentional wrongdoing. In *Fedele v. National Liberty Ins. Co.,* 184 Va. 528, 35 S.E.2d 766 (1945), the Virginia Supreme Court held that "elementary principles of public policy" precluded an insured from recovering under a fire insurance policy for property he fraudulently set on fire. While this appears to be the sole Virginia Supreme Court decision that addresses the public policy coverage exclusion for intentional wrongdoing, no reason exists to believe that Virginia courts today would not continue to adhere to *Fedele.* Indeed, in the only other reported case that addresses the public policy coverage exclusion in Virgi-

nia, *Atlantic Permanent Fed. Sav. & Loan Assn. v. American Casualty Co.,* 839 F.2d 212 (4th Cir.), *cert. den.* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988), the Fourth Circuit cited *Fedele* with approval in delineating the contours of the public policy exclusion in Virginia. Specifically, the court held that the "intentional wrongdoing" exclusion only applied to "cases where the insured acted with the specific intent to cause harm." *Id.* at 217. In so doing, the Fourth Circuit read *Fedele* as consistent with the rule adopted in many other jurisdictions. *See Freedman's Richards on Insurance* § 1:13 (6th ed. 1990) (" 'intentional act' exclusion generally calls for a specific intent to cause injury, damage or loss as the threshold requirement for applying the exclusion").

Other jurisdictions have also recognized exceptions to the public policy bar. Particularly instructive in this regard is the decision of the Michigan Court of Appeals in *Vigilant Insurance Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382 (1982). There, the court held that public policy principles did not preclude coverage under a professional liability policy for a psychiatrist's intentional sexual abuse of a patient. In so holding, the *Kambly* court noted that no specific exclusion for intentional abuse existed in the policy and that limitations on such coverage must be clearly expressed where no reason exists to distinguish such intentional acts from other forms of malpractice covered under a professional liability policy. Moreover, the court held that:

[T]he public policy considerations raised by plaintiff which prohibit the insurability of criminal or intentionally tortious conduct are not present here. Initially, it is unlike-

axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct"); *Couch on Insurance* § 39:15 (2d ed. 1985) ("[a]ny insurance which purports to protect the insured against any loss which he may purposely or wilfully cause, or which may arise from his immoral, fraudulent or felonious conduct, is void against public policy"); *Freedman's Richard's on Insurance* § 1:13 (6th ed. 1990) ("[i]t is universally recognized that an implied exception to coverage under any form of insurance is an intentional or expected injury, damage, or loss").

*See also St. Paul Ins. Co. v. Talladega Nursing Home, Inc.,* 606 F.2d 631 (5th Cir.1979) (apply-

ing Alabama law and holding that all contracts insuring against loss from intentional wrongs are void as against public policy); *Hartford Life Ins. Co. v. Title Guarantee Co.,* 520 F.2d 1170, 1175 (D.C.Cir.1975) (against public policy for "knowledgeable and intentional wrongdoer" to insure against his own actions); *American Surety Co. v. Gold,* 375 F.2d 523 (10th Cir.1966) (coverage for punitive damages under Kansas law against public policy because such coverage would permit individual to insure himself against wanton and willful acts); *Haser v. Maryland Casualty Co.,* 78 N.D. 893, 53 N.W.2d 508, 512 (1952) ("to indemnify insured against his own violation of the law is void against public policy").

ly that the insured was induced to engage in the unlawful conduct by reliance upon the insurability of any claims arising therefrom or that allowing insurance coverage here would induce future similar unlawful conduct by practitioners. Nor does it appear that the policy was obtained in contemplation of a violation of the law [citation omitted]. Furthermore, coverage does not allow the wrongdoer unjustly to benefit from his wrong. It is not the insured who will benefit, but the innocent victim who will be provided compensation for her injuries [citation omitted]. In this instance, there is great public interest in protecting the interests of the injured party.

*Id.* 319 N.W.2d at 384. Other courts have followed this approach in permitting coverage under professional liability policies for intentional torts committed by health professionals.[11] And this analysis fits this case as well. In the first place, the policy contains no specific coverage bar for intentional torts or criminal activity. Had St. Paul wished to exclude intentional misconduct from coverage, it could have inserted an appropriate exclusionary clause in the policy. *See e.g., Rivera v. Nevada Medical Liability Ins. Co.,* 107 Nev. 450, 814 P.2d 71 (1991) (coverage for sexual assault by doctor denied where policy included specific exclusionary clause relating to intentional criminal activity and sexual assault). But St. Paul's failure to include an explicit exclusionary clause in its policy does not, standing alone, support an exception to the general public policy coverage bar for intentional torts.

Rather, as in *Kambly* and its progeny, the instant case does not implicate the policy considerations that generally trigger operation of the public policy coverage bar. First, there is no evidence that Jacobson was induced to inseminate his patients with his own semen because of the availability of insurance coverage. In addition, it is unlikely that permitting coverage for Jacobson's misconduct will encourage other medical professionals to engage in similar behavior. Indeed, the existence of criminal sanctions for such activity is undoubtedly a greater deterrent than the prospect of uninsured liability for civil claims. Furthermore, there is no evidence, nor does St. Paul allege, that Jacobson obtained the policy in contemplation of his misconduct. Thus, this case does not raise the policy concerns that are at the heart of the public policy exclusion for intentional wrongdoing.

Moreover, countervailing considerations, i.e., compensating Jacobson's innocent vic-

---

11. *See St. Paul Fire & Marine Insurance Co. v. Asbury,* 149 Ariz. 565, 720 P.2d 540 (Ct.App. 1986) (citing *Kambly* ) (public policy not violated by coverage for gynecologist's sexual misconduct in course of medical examination); *Collins v. Covenant Mutual Ins. Co.,* 604 N.E.2d 1190 (Ind. Ct.App.1992) (citing *Kambly* ) (public policy not violated by coverage for physician's intentional torts during medical treatment of patient); *cf. St. Paul Fire & Marine Ins. Co. v. Love,* 447 N.W.2d 5 (Minn.Ct.App.1989) (citing *Kambly* ) (public policy not violated by coverage of psychologist's sexual misconduct during treatment of patient); *Dillon v. Callaway,* 609 N.E.2d 424 (Ind.Ct.App. 1993) (citing *Kambly* ) (public policy not violated by extension of state medical malpractice act to cover psychiatrist's intentional sexual abuse of patient).

Even prior to *Kambly,* courts recognized exceptions to the general public policy coverage bar based on factors similar to those set forth by the *Kambly* court, particularly where an innocent third party or beneficiary was involved. *See e.g., Ambassador Ins. Co. v. Montes,* 76 N.J. 477, 388 A.2d 603 (1978) (coverage for insured's arson of own property did not violate public policy where wrongdoer did not benefit and third person received protection afforded by insurance); *Dent v. Virginia Mut. Ben. Life Ins. Co.,* 226 A.2d 166 (D.C.1967) (permitting recovery of amount of life insurance policy by innocent beneficiary where insured's criminal conduct led to his death did not violate public policy); *Valley Forge Life Ins. Co. v. Lawrence,* 201 So.2d 449 (Fla.1967) (where no specific exclusion clause existed in life insurance policy, payment of benefits to estate of insured, who was killed during armed robbery, did not violate public policy where policy not obtained in contemplation of violation of law and denial of coverage would not deter deceased insured). *See also Ranger Ins. Co. v. Bal Harbour Club, Inc.,* 549 So.2d 1005, 1007 (Fla.1989) (holding in case decided after *Kambly* that indemnification of insured for intentional discrimination violated public policy but recognizing exceptions to coverage exclusion exist in cases "where innocent third parties were involved or it appeared unlikely that the wrongful act could have been produced by the prospect of coverage"); *Aetna Life and Casualty Co. (Casualty & Surety Div.) v. McCabe,* 556 F.Supp. 1342 (E.D.Pa.1983) (holding in post-*Kambly* case that public policy not violated by coverage of physician's intentional acts where no explicit exclusion clause in policy and innocent beneficiary involved).

tims, decidedly outweigh the concern that Jacobson and RGC will unjustly benefit from the extension of coverage. Admittedly, Jacobson and RGC will clearly benefit from coverage under the policy because they will, to the extent of the policy limits, be insulated from personal civil liability. Equally clear, however, is that the primary beneficiaries of this coverage will be innocent third parties, namely the female patients whom Jacobson fraudulently inseminated and their families. The strong policy interest in compensating these innocent victims tips the scales in this case in favor of coverage. And this result is not manifestly unfair to the insurer because, as noted above, St. Paul was in a position to include in the policy a specific exclusion in the insurance contract for intentional misconduct.[12] It failed to do so. Therefore, given the absence of specific exclusionary language, and given the absence of compelling policy reasons to bar coverage, public policy does not operate here to preclude coverage. As a result, St. Paul has a duty to defend Jacobson and RGC in civil actions arising from Jacobson's fraudulent insemination of patients and a duty to indemnify these defendants should plaintiffs in these actions prevail.[13]

### V.

In sum, St. Paul's rescission claim fails, the policy is valid, and it encompasses claims associated with the provision of medical services relating to artificial insemination. Moreover, permitting insurance coverage for Jacobson's actions does not violate public policy. Accordingly, defendants' motion for summary judgment is granted, and St. Paul's motion for summary judgment is denied.[14] An appropriate order will issue.

---

12. In general, cases barring coverage on public policy grounds involve policies that contain language specifically excluding coverage for intentional wrongdoing. *See e.g., Germantown Ins. Co. v. Martin, supra,* 407 Pa.Super. 326, 595 A.2d 1172 (1991) (policy contained language excluding from coverage injury or damage "expected or intended" by insured), *Cunningham & Walsh, supra,* 744 P.2d 1317 (Or.Ct.App.1987) (policy excluded coverage for injury or damage "expected or intended" by insured); *Continental Ins. Co. v. McDaniel,* 160 Ariz. 183, 772 P.2d 6 (Ct.App. 1988) (same).

13. Though not presented here, St. Paul may be entitled to recover from Jacobson and RGC any amounts eventually paid out under the policy under the doctrine of equitable subrogation. *See Ambassador Ins. Co. v. Montes,* 76 N.J. 477, 388 A.2d 603 (1978).

14. Although this case raised novel, dispositive issues of state law, none of the parties requested certification to the Virginia Supreme Court pursuant to Rule 5:42, *Rules of the Virginia Supreme Court.*