## Richmond

## ELISHA A. HARRELL, ET AL. v. NORTH CAROLINA MUTUAL LIFE INSURANCE COMPANY.

April 28, 1975.

Record No. 740292.

Present, All the Justices.

*Girard C. Larkin, Jr. (Stanley E. Sacks; Sacks, Sacks & Tavss,* on brief), for plaintiffs in error.

*Sterling W. Walker (W. Wayne Perry* [N. C.], on brief), for defendant in error.

Compton, J., delivered the opinion of the court.

The narrow issue presented by this appeal is whether the defendant insurer sustained its burden to prove clearly that untrue statements made in an application for a policy of life insurance were material to the risk assumed.

At the time of her death on October 10, 1971, Ethel H. Foxx was the insured in an ordinary life policy in the amount of $15,000 issued by defendant, North Carolina Mutual Life Insurance Company, in which plaintiffs, Elisha A. Harrell and

William H. Harrell, brothers of the insured, were the primary beneficiaries. The Harrells were denied recovery of the face amount of the policy by the court below, sitting without a jury, on the ground that the decedent had made representations of fact in her application for the insurance which were material to the risk and untrue.

Mrs. Foxx was a resident of Hampton, Virginia, and Dean of Women at Hampton Institute. On June 6, 1970, she made application for the life insurance policy in question through the company's agent, Daniel J. Jordan, of Newport News. The required medical examination of Mrs. Foxx was performed on June 13, 1970, by Dr. George Stephens who was retained and paid by the company. The physician reported nothing abnormal or unusual except for a "midline oper scar." The doctor testified that, other than the scar, the condition of her health was good and she was normal in her anatomy. At the time of the medical examination certain questions, which formed Part Two of the application for insurance, were asked her by Stephens, and the answers were written and witnessed by him. She answered questions I, J and K as follows:

"I. Have you ever undergone a surgical operation? Yes Fibroid Ut[erus]

"J. Have you ever been a patient in any hospital, sanitarium, or asylum? No

"K. Have you consulted a doctor for any cause not included in the above answers? No"

In her application, and specifically referring to her answers to the questions asked by the medical examiner, Mrs. Foxx declared that her answers were full, complete and true; that she was a proper subject for life insurance; that she made the answers to obtain the insurance; and that she understood and agreed "that they are each material to the risk and that the Company believing them to be true will rely and act upon them."

After the medical examination, the insured's application for life insurance and the examining physician's report were forwarded to the insurer's home office in Durham, North Carolina, by its Newport News district office. In the home office the application was processed, and the policy was thereafter issued and delivered to Mrs. Foxx. She paid all premiums due thereon until her death.

When the claim was made and the proof of death submitted, the accompanying death certificate showed that the decedent died of "respiratory arrest" due to "carcinomatosis — 1 year due to primary breast cancer — 2 years." This information resulted in an investigation by the company and a denial of the claim on the ground that the insured had given false and untrue statements in her application for insurance and in response to the questions asked her by Dr. Stephens. This suit ensued.

The evidence disclosed that Mrs. Foxx had been hospitalized for carcinoma of the breast in 1965, 1969 and 1970. Prior to 1965, she had been hospitalized for fibroids of the uterus. During each hospitalization she had undergone a major operation of a serious nature. Within two weeks after being discharged from the 1970 hospitalization, she signed the application which is in controversy here.

Plaintiffs rely upon Code § 38.1-336 which provides, in pertinent part, that no statement in an application for insurance "shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue." The insurer maintains that the evidentiary requirements of the statute have been met. The plaintiffs claim that the company failed to carry its burden to prove clearly that the foregoing answers were material to the risk when assumed. We agree and reverse.

One of the purposes of Code § 38.1-336 is to relieve against the rigorous consequences of the common law rule that answers to questions in applications for insurance imply that the subject matter of the questions and answers is material, and that if such statements and answers are not true the policy is voidable. *Sterling Insurance Company* v. *Dansey*, 195 Va. 933, 943, 81 S.E.2d 446, 451 (1954). Under the explicit mandate of the statute, the insurer had the burden of *clearly* proving that the insured's answers in her application were material to the risk assumed and were untrue. *Mutual of Omaha Insurance Company* v. *Echols' Adm'rs.*, 207 Va. 949, 952, 154 S.E.2d 169, 171 (1967). Materiality of a misrepresentation is an affirmative defense. *Hawkeye Security Insurance Company* v. *Government Employees Insurance Company*, 207 Va. 944, 947, 154 S.E.2d 173, 175 (1967). Whether a representation is made and the terms on

which it is made are questions for the trier of fact; but when, as here, a misrepresentation is proved, its materiality is a question of law for the court. *United States Fidelity and Guaranty Company* v. *Haywood,* 211 Va. 394, 396, 177 S.E.2d 530, 532 (1970); *Chitwood* v. *Prudential Insurance Company of America,* 206 Va. 314, 318, 143 S.E.2d 915, 918 (1965). "A fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy." *Mutual of Omaha* v. *Echols' Adm'rs., supra,* 207 Va. at 953-54, 154 S.E.2d at 172.

The insurer produced abundant evidence which showed that Mrs. Foxx answered falsely questions J and K in the application and that she gave a misleading answer to question I. But for some unexplained reason, it failed to offer evidence which *clearly* proved that truthful answers to questions I, J and K would reasonably influence its decision whether or not to issue the policy.

Fred Cook, district manager of the insurer's Newport News office, testified that he received the application from Jordan, the agent, and the medical examiner's report from Dr. Stephens, and forwarded them to the home office for issue. The trial judge asked this witness: "In receiving this in your office, did you place any reliance, or did you not place any reliance upon the application and the medical report? " Cook answered: "No. We do not do that in the District Offices, Your Honor." He said the home office passed on applications and medical reports.

Arthur J. Clements, claims supervisor of the company, received the claim following Mrs. Foxx's death. He testified that he did not participate in the issuance or delivery of the Foxx policy, but that his responsibility was to pass on the payment or the rejection of claims. He further stated that if the Foxx application and the Stephens medical report had indicated that Mrs. Foxx had been confined in the hospital, he would have paid the claim. He stated that under those circumstances he would have "concluded that the company had notice of these [hospital] confinements, had issued the policy, and therefore would have waived its privilege to deny liability. But we had no knowledge of these confinements." The trial judge asked: "What reliance, if any, do you place upon the statements in the physician's report and the questions asked by him and signed by the Plaintiff in connection with the previous hospitalization?" Clements

answered: "The reasonable course of business." He did not elaborate further.

The only connection Jordan, the agent, had with the transaction was the taking of the application, its delivery to the company's district office, and the delivery by him of the policy to the insured. Jordan answered affirmatively when asked if he knew "if this policy was issued based upon the papers, the application and medical examination that was sent to the home office." This testimony is insufficient to prove clearly materiality.

The company failed to present the testimony of an underwriter, a person ordinarily charged with the responsibility of examining and evaluating the applications submitted. No witness testified as to the policy of the company in considering such applications. The decision to issue or not to issue a policy was not within the responsibility of the agent who took the application, of the district manager who forwarded it to the home office, or of the claims supervisor who became involved only after the death of the insured.

On more than one occasion the trial judge sought, without success, to elicit some information regarding the policy of the company in passing upon applications. At one point during the trial, he said: "I need somebody from the home office, or whoever takes it into consideration, to testify to that fact." During final argument, he observed: "Gentlemen, I have waited in vain to hear somebody testify that they would not have issued this policy if they had known that Mrs. Foxx actually was in the hospital. I have waited in vain to hear this. Now, if somebody had testified to this effect, I don't think there would be any question about this."

While it is incredible that any responsible insurance company would have issued a policy of life insurance to Mrs. Foxx with knowledge that she had recently been released from a hospital after a major operation for carcinoma of the breast, and with knowledge that she had a history of other hospitalizations for cancer, we will not take judicial notice of this fact. The burden of *clearly* proving the affirmative defense of materiality of a misrepresentation is not carried when the court, to find the fact, must resort to assumption and conjecture.

Accordingly, the judgment of the court below is reversed, and

final judgment will be entered here in favor of the plaintiffs for the face amount of the policy.

*Reversed and final judgment.*

Poff, J., dissenting.

I would affirm. The evidence was fully sufficient to support the judgment.

I agree that the evidentiary burden required to void an insurance contract is heavier than a preponderance of the evidence. Under Code § 38.1-336, the insurer must produce clear proof of falsity and materiality of the representations made by the insured.

Here, the evidence is not only clear but uncontradicted that:

In 1952, the insured underwent a hysterectomy for fibroids of the uterus;

In 1965, she had a right radical mastectomy for carcinoma of the breast;

In 1969, she was hospitalized for carcinoma of the breast with multiple bony metastases requiring surgery described as right oophorectomy;

On June 1, 1970, she was discharged from the hospital following surgery incident to carcinoma of the breast, metastatic breast cancer, advanced stage;

Thirteen days later, she gave answers to questions on an application for life insurance which falsified all of her medical history except the 1952 hysterectomy; and

The insurer had no knowledge of the insured's true medical history and no reason to suspect that her representations were false.

This evidence is clear proof that the insured's representations were false and that they concealed an illness which, in the ordinary course of human experience, shortens normal life expectancy and enlarges the risk assumed in life insurance contracts. The inference arising from that evidence is equally clear; had the insurer known the truth the insured concealed, it would have rejected the risk, conditioned the coverage, or increased the premium rate. In the "reasonable course of business", it necessarily relied upon the insured's repre-

sentations. The majority acknowledge that "it is incredible that any responsible insurance company would have issued a policy of life insurance to Mrs. Foxx with knowledge" of her true medical history. Nothing in Code § 38.1-336 requires courts making determinations of materiality to blind themselves to such realities.

Yet, the majority apply a rule that says that proof of materiality is not acceptably "clear" if it rests on an inference of reliance. Under that rule, no matter how clear the evidence and the inferences arising from it may be, it fails to satisfy the statutory evidentiary standard unless the insurer calls a witness (who apparently must be no less than an underwriter) to give rote testimony that it would not have issued the subject policy if it had known the truth. While such testimony is, of course, relevant to the determination of materiality of the misrepresentation, it should not be made, by judicial fiat, a *sine qua non* of proof of materiality. Materiality should not fail for want of a self-serving declaration of an interested witness if materiality otherwise clearly appears.

The majority borrow the rule they apply here from other cases, all of which are factually distinguishable. While that rule may be appropriate when the facts in evidence do not justify an inference of reliance, *see, e.g., Scott* v. *State Farm Mutual,* 202 Va. 579, 118 S.E.2d 519 (1961), when, as here, materiality is shown by clear proof of facts which raise a clear inference of reliance, formalistic testimony of reliance is needlessly cumulative. Justice is seldom served by empty ritual. The statute requires clear proof, not evidentiary over-kill.

Harrison and Cochran, JJ., join in this dissent.