## TIME INSURANCE COMPANY

v.

## DORIS J. BISHOP, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF BEEKEN E. BISHOP, DECEASED

Record No. 920348

January 8, 1993

Present: All the Justices

*Melissa Warner Scoggins; Daniel Patrick Frankl (Gentry, Locke, Rakes & Moore*, on briefs), for appellant.

*Charles R. Beller, III (Paul M. Barnett; Crowgey & Barnett*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

The sole issue in this insurance case is whether the evidence establishes as a matter of law that an insured knowingly misrepresented a material fact in his application for insurance.

On July 1, 1987, Beeken E. Bishop applied for a policy of hospitalization and life insurance to be issued by Time Insurance Company (Time). Charles M. James, an agent of Time, filled in an application for this insurance by recording Bishop's answers to the questions on Time's application form. In a section entitled "Evidence of Insurability," the following question was asked of Bishop: "To the best of your knowledge and belief, have you or any family member applying for the insurance: 1. Ever had any indication, diagnosis or treatment for: . . . use of alcohol or drugs?" James recorded Bishop's negative response in the "No" block opposite this question.

In fact, however, unbeknownst to Time or James, Dr. Michael E. Slayton, an internal medicine specialist in Montgomery County, had been treating Bishop during the preceding 15-month period for physical problems arising out of Bishop's abuse of alcohol. Dr. Slayton's treatment involved eight office visits and one hospitalization.

James checked the appropriate ''Yes'' blocks to indicate Bishop's affirmative responses concerning his confinement in a hospital during the preceding five years and his treatment by a physician within the preceding two years. And, with the information furnished by Bishop, in the blank space next to these questions, James wrote: ''Beeken had Broken Blood Vessell in Esophagus in Sept 1986 Treated at Montgomery Hospital by Dr. Slayton for 10 Days—Fully Recovered.'' (Quoted with errors in spelling and grammar from the original.) Again, unknown to Time and James, Dr. Slayton's notes regarding this hospital discharge stated, among other things, that Bishop had ''alcoholic liver disease with portal hypertension [and] chronic alcohol abuse.''

The application contained the following language just above Bishop's signature:

> I represent that all statements and answers to the above questions are complete and true to the best of my knowledge and belief. I apply for insurance to be issued solely in reliance upon this application. I understand that the insurance contains a two year contestability period in the event of material misrepresentation.

After James completed the application, Bishop read and signed it. On August 1, 1987, without any further investigation, Time issued the policy.

Thereafter, Dr. Slayton and others continued to treat Bishop for his alcohol-related and other problems. When Time received the bills for such treatments, it began an independent investigation of Bishop's medical history to determine whether it should contest coverage on the ground that Bishop had given false information in his application.

However, on January 31, 1989, before Time's investigation was completed, Bishop died in a Roanoke hospital. Bishop's death was attributed to cirrhosis of the liver caused by his excessive use of alcohol.

Upon Time's refusal to pay Bishop's bills for treatment and the life insurance benefits provided by the policy, his widow, Doris J. Bishop, individually and as administrator of his estate, filed this action seeking damages for Time's breach of contract. Time agreed in the trial court that if it were liable under its policy, it would be responsible for Bishop's medical, nursing, and hospital expenses in the sum of $130,625.10 and life insurance benefits of $10,000.

At a jury trial, Time asserted that the policy was void because of Bishop's material misrepresentations, and it introduced evidence in support of this affirmative defense. One of Time's witnesses was Dr. Slayton, whose notes of Bishop's first interview disclose that Bishop ''readily admits that his main problem is one of excessive alcohol consumption. For at least the last 5 years, he has drank alcohol to excess of as much as a fifth a day.''

In describing his treatment of Bishop for liver disease and associated illnesses linked to Bishop's abuse of alcohol in the 15 months prior to Bishop's application for insurance, Dr. Slayton testified that:

We explained to him that we thought he had liver disease as a complication of alcohol exposure.

. . . .

[W]e spoke to him at length about the concerns that we had about continued alcohol exposure on his part and requested that he abstain henceforth. We tried to educate him as to the risk of not doing so. . . . I dare say that the gist of the conversation was that continued alcohol exposure would be extremely dangerous and may result in further complications of the problem other than what we had already seen.

And in each of Bishop's eight office treatments, Dr. Slayton stressed the importance of abstaining from alcohol.

To assist Bishop in abstaining from alcohol, Dr. Slayton prescribed two drugs that are similar to drugs used in detoxification facilities. Initially, he prescribed Valium or Diazepam, anti-anxiety medication that ''might be beneficial to [Bishop] if indeed he was going to be compliant as far as alcohol abstinence.'' When Bishop reported on one of those visits that he had resumed drinking, Dr. Slayton changed the prescription from Valium or Diazepam to

Librium, another anti-anxiety medication, to help "wean" Bishop off alcohol.

The court submitted to the jury the issue whether Bishop's alleged misstatements were "knowingly" made. The jury returned a verdict in favor of the plaintiff in the agreed amount, and Time appeals.

■ Time had the affirmative burden of "clearly" proving that Bishop's representation was untrue and that it was material to the risk. *Mutual of Omaha Ins. Co. v. Dingus*, 219 Va. 706, 713, 250 S.E.2d 352, 355 (1979). We think Time carried this burden of proof.

In responding to Time's questions, Bishop clearly misstated the facts in denying that he "ever had any indication, diagnosis or treatment" for "use" of alcohol. The evidence is overwhelming that Dr. Slayton was treating Bishop for conditions directly related to the latter's use of alcohol.

And Bishop's representation would be material to the risk if it would reasonably influence the insurance company in deciding whether to issue the policy. *Mutual of Omaha Ins. Co. v. Echols*, 207 Va. 949, 953-54, 154 S.E.2d 169, 172 (1967). Steven Liebherr, Time's underwriting supervisor, testified that given the information on Bishop's application, Time would have decided to issue the policy without any additional investigation and at standard premium rates. Liebherr testified further, however, that if Bishop had disclosed that he had consulted Dr. Slayton for alcohol-related problems during the 15-month period preceding the issuance of the policy, Time would not have issued the policy.

■ There was no contradiction of Time's evidence relating to the falsity or the materiality of Bishop's representation. Hence, the trial court should have ruled as a matter of law that the representation was both untrue and material.[1]

■ The plaintiff argues correctly, however, that because Bishop's application recited that his answers were correct "to the best of [his] knowledge and belief," Time had the further burden of establishing that Bishop's false statement was "knowingly" made. *Old Republic Life Ins. Co. v. Bales*, 213 Va. 771, 773, 195 S.E.2d 854, 856 (1973). And, the plaintiff maintains, because the evidence was in conflict on this issue, a jury question was created.

---

[1] Ordinarily, the trial court decides the issue of materiality as a matter of law where a misrepresentation has been proved. *Harrell v. North Carolina Mut. Life Ins. Co.*, 215 Va. 829, 831-32, 213 S.E.2d 792, 794 (1975). Inexplicably, here, the trial court neither decided the issue itself nor submitted it to the jury.

We do not agree. In this phase of the case, the plaintiff called Susan Dawn Pauley, director of the substance abuse division of the local Community Services Board, and qualified her as "an expert in the field of substance abuse counselling." Over Time's objection, Pauley was permitted to testify that alcohol abusers unconsciously use a "defense mechanism" termed "denial," by which they "deny information."

■ However, even though a jury may have accepted Pauley's testimony of Bishop's probable "denial" or "rationalization" as an indication that *he* did not believe he had a problem with alcohol, whether he had a problem with alcohol was not the question he was asked in the application. Rather, the question was whether, to the best of his knowledge and belief, he had ever had *any indication,*[2] *diagnosis or treatment* for use of alcohol. And, with respect to that question, Pauley's testimony about Bishop's state of denial was irrelevant.[3]

A similar observation may be made concerning testimony elicited from members of Bishop's family. These witnesses testified variously that no one ever told Bishop he was an alcoholic, that neither the family members nor Bishop himself regarded him as an alcoholic because he worked regularly and led a normal life, that after his period of hospitalization in September 1986, he said "[he would] never touch another drop," and that he did, in fact, abstain for a period of time. But with the question in the application focused narrowly upon indication, diagnosis, or treatment for the use of alcohol, whether Bishop himself or someone else believed he was not an alcoholic was completely beside the point.[4]

---

[2] "Indication" is defined in part as "something (as a signal, sign, suggestion) that serves to indicate." Webster's Third New Int'l Dictionary 1150 (1986).

[3] Because we consider Pauley's testimony about Bishop's state of denial irrelevant, we do not decide whether it also constituted an inadmissible expression of opinion on the ultimate fact in issue.

[4] Our research discloses only one similar case, *Leigh v. Consumers Nat'l Life Ins. Co.,* 240 Or. 290, 401 P.2d 46 (1965). There, an applicant had been told that he was an alcoholic, and he had received treatment for alcoholism. In an application for insurance, he answered in the negative a question whether he had "ever taken treatment or a 'cure' for alcoholism." The insurance company denied coverage, claiming that because the insured had been treated for alcoholism, the answer was false.

Oregon law required that false representations on applications for insurance be shown to have been "knowingly made." The insured contended that even though his answer was

■ Given the evidence concerning Bishop's excessive use of alcohol, the admission he made to Dr. Slayton that alcohol was his "main problem," the warnings he received from Dr. Slayton about the effect of his continued use of alcohol upon his already damaged liver, and the prescriptions for drugs Dr. Slayton gave him to help him stop drinking alcohol, we hold that no reasonable person could conclude that Bishop unknowingly made the misrepresentation concerning whether he had any indication, diagnosis, or treatment for the use of alcohol. The trial court erred, therefore, in failing to rule as a matter of law that Time is not liable to the plaintiff for breach of contract.

Accordingly, we will reverse the judgment of the trial court and enter final judgment here for Time.

*Reversed and final judgment.*

JUSTICE COMPTON, with whom JUSTICE STEPHENSON and JUSTICE LACY join, dissenting.

I do not agree that final judgment should be entered for the insurer. Rather, I would reverse the judgment in favor of the plaintiff and remand the case for a new trial upon all issues.

The main inquiries upon appeal are whether the testimony of the plaintiff's expert witness created an issue for the jury upon the question of knowing misrepresentation and whether the expert erroneously was permitted to give an opinion on the ultimate fact in issue. Upon the former inquiry, the majority says that the evidence established conclusively that Bishop knowingly made a false statement in his application and that the insurer was, therefore, entitled to judgment as a matter of law. I disagree.

The printed application contained a section labelled "Evidence of Insurability." The following language appeared in this section: "To the best of your knowledge and belief, have you or any family member applying for insurance: 1. Ever had any indication, diagnosis or treatment for: . . . i. use of alcohol or drugs?" When asked this question, the decedent answered in the negative, and the agent checked a block labelled "No" opposite the question.

---

false, it was not made knowingly because he was "in denial." Holding that the misrepresentation had been made knowingly, the Oregon court pointed out that the application did not ask whether the insured believed he was or was not an alcoholic, but whether he had been treated for alcoholism. *Id.* at 291-93, 401 P.2d at 47.

The agent asked the following application question: "2. Been confined to a hospital or similar institution within the past 5 years?" The decedent answered in the affirmative, and the agent checked the "Yes" block opposite this question.

The agent asked the following additional question: "3. Been seen or treated by a physician or taken any medication within the past two years?" The decedent answered affirmatively, and the agent checked the "Yes" block opposite this question.

The agent documented on the application additional information furnished at the time by the decedent pertaining to questions 2 and 3. In space available opposite those questions, the agent wrote the following, complete with spelling and grammatical errors: "Beeken had Broken Blood Vessell in Esophagus in Sept 1986 Treated at Montgomery Hospital by Dr. Slayton for 10 days—Fully Recovered."

The essence of the testimony of Pauley, the plaintiff's expert, was that persons who abuse alcohol employ unconsciously a "defense mechanism" known as "denial." This is manifested, she said, when "people deny information. They find ways in their mind, through rationalizing or minimizing or other ways, to basically deny something that is real for their life or that others see exists." She stated, "Rationalizing means taking information and making it make sense to you in some way even if it doesn't make sense to other people." Elaborating, she testified that rationalizing "is a lot of excuse making. But it is really not just excuse making. It is turning it around so it makes sense to you even though it may not make sense to other people." She said that because of "denial" and "rationalization," abusers of alcohol "believe their own excuses."

The following colloquy between the witness and plaintiff's counsel illustrates the expert's opinions as related to the decedent:

"Q. Okay. How could somebody go to the doctor and, whether he volunteered it to the doctor or the doctor in getting a medical and social history forced them to admit, 'Yes, I have drunk as much as a fifth a day,' and the doctor says, 'You have liver problems and your drinking hurts your liver problems and you have to stop,' and every time he checks back with the doctor the doctor reiterates about, 'You have to stay off the liquor,' how could somebody like that not know that they have an alcohol problem?

"A. Because denial is a very powerful and potent defense mechanism. I deal with people who have had charges directly related to alcohol usage, have family members confront them with information about their behavior when they are under the influence who still remain in denial. The family even remains in denial; it is not just the individual.

"Things usually have to get pretty chaotic or some major crisis occurs before something breaks through and someone realizes that alcohol and drugs have something to do with this situation. Denial is [a] very powerful defense mechanism."

Code § 38.2-309 provides, as pertinent, that no statement in an application for insurance "made before . . . loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue." Materiality of a misrepresentation is an affirmative defense, and the burden is upon the insurer of "clearly" proving that the applicant's answers in the application were material to the risk assumed and were untrue. *Harrell* v. *North Carolina Mut. Life Ins. Co.*, 215 Va. 829, 831, 213 S.E.2d 792, 794 (1975). "In a case like this, whether a representation is made and the terms on which it is made are questions of fact for the jury; but when a misrepresentation is proved, its materiality is a question of law for the court." *United States Fidelity & Guaranty Co.* v. *Haywood*, 211 Va. 394, 396, 177 S.E.2d 530, 532 (1970). "A fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy." *Mutual of Omaha Ins. Co.* v. *Echols*, 207 Va. 949, 953-54, 154 S.E.2d 169, 172 (1967).

As I have said, whether a statement is untrue is a question of fact for the jury in an ordinary case, and the burden is upon the insurer to prove "clearly" that the statement in an application is untrue. Clear proof of the mere falsity of the statement is sufficient in the ordinary case. But this is not the ordinary case because in the application submitted by the decedent it was recited that his answers were correct "to the best" of his "knowledge and belief." Where there is such a recitation, the burden upon the insurer increases from that specified in Code § 38.2-309 to clear proof that the answer is *knowingly* false. *Old Republic Life Ins. Co.* v. *Bales*, 213 Va. 771, 773, 195 S.E.2d 854, 856 (1973).

Proof leading to a determination of the knowing falsity of a statement made on an application for insurance by a potential insured is uniquely subjective. The inquiry is just what the applicant knew and believed at the time of the application. Here, the insurer's evidence that Bishop knew about his condition resulting from the use of alcohol was contradicted by the testimony of the plaintiff's expert witness. That testimony established that Bishop suffered from the defense mechanism of "denial" and thus supported a jury finding that he told the truth as he knew and believed it at the time of the application. In other words, there was sufficient evidence for a jury to conclude that Bishop answered the questions on the application truthfully to the best of his knowledge and belief; the jury could have found that Bishop never actually believed or accepted the fact that he was being treated for the use of alcohol, even though the answer he gave was blatantly false.

The majority dismisses the expert opinion testimony as "irrelevant" because the majority claims that whether Bishop believed "he had a problem with alcohol was not the question he was asked in the application." However, the obligation of a potential insured is to "answer questions truthfully and as he understands them." *Flannagan* v. *Mutual Ins. Co.*, 152 Va. 38, 67-68, 146 S.E. 353, 361 (1929). Not only does the expert testimony create a dispute regarding Bishop's state of knowledge and belief at the time of the application, the expert testimony also creates an issue upon whether the question was "misleading, ambiguous or confusing," *id.*, to one who suffered from denial.

In *Sterling Insurance Co.* v. *Dansey*, 195 Va. 933, 81 S.E.2d 446 (1954), this Court construed the meaning of the language in an insurance application that answers are "true to the best knowledge and belief of the applicant." *Id* at. 941, 81 S.E.2d at 451. In that case, the question whether an insurance applicant made a knowing misrepresentation was implicitly recognized as a question for the jury. *Id.* at 937, 81 S.E.2d at 449. Subsequently, in *Old Republic Life Insurance Co.* v. *Bales, supra,* this Court explicitly recognized that, in the face of conflicting evidence, whether a knowing misrepresentation was made was "peculiarly within the province of the jury." 213 Va. at 772, 775, 195 S.E.2d at 856, 858. *Cf. Mutual of Omaha Ins. Co.* v. *Echols, supra* (recognizing that the issue of a knowing misrepresentation was a question for the jury but finding that the applicant's "statements were not true and correct to the best of her knowledge and belief" because of admissions in her motion

for judgment). Because I believe the evidence on the issue of Bishop's knowing misrepresentation to the question as he understood it was in dispute, I believe the issue was peculiarly within the province of the jury.

Consequently, I would hold that the trial court did not err in submitting the misrepresentation issue to the jury. The insurer argues, however, that even if the issue was properly submitted to the jury, the plaintiff's expert was allowed to testify at least on one occasion, to the ultimate fact in issue and that the trial court committed reversible error in permitting such testimony. I agree.

In Virginia, we are committed to the rule that while an expert witness may be permitted to express an opinion relating to the existence or nonexistence of facts not within common knowledge, the expert cannot give an opinion upon the precise or ultimate fact in issue, which must be left to the trier of fact for determination. *Webb* v. *Commonwealth*, 204 Va. 24, 33, 129 S.E.2d 22, 29 (1963); *Venable* v. *Stockner*, 200 Va. 900, 904-05, 108 S.E.2d 380, 383-84 (1959); *Thornton* v. *Commonwealth*, 113 Va. 736, 744, 73 S.E. 481, 484 (1912). *Accord Bond* v. *Commonwealth*, 226 Va. 534, 538, 311 S.E.2d 769, 771-72 (1984).

Here, plaintiff's counsel directed the expert Pauley's attention to the application in question. The expert testified that she found "significant" the fact that the insurer had placed the use of alcohol and drugs on the same line in the application. She said: "Often someone who has a problem with just alcohol doesn't see themself as a substance abuser or a drug addict. Many people don't even recognize that alcohol is a drug." She testified: "Putting those two on the same line is something that, in my opinion, with Mr. Bishop could feed in to denial."

Again, referring to the application, plaintiff's counsel elicited the following answer with this question:

"Q. You mentioned 'to the best of your knowledge and/or belief.' What is the significance of that so far as Beeken Bishop is concerned?

"A. The other piece is that as you go down he did answer no to that. But when he was asked about seeing a doctor or being in a hospital he answered yes.

"In my opinion, that is another indicator that he wasn't consciously saying, 'Oh, I have an alcohol thing that I need to hide,' because he did acknowledge that he had seen a doctor and been in a hospital and had given them information. . . .

. . . .

"Basically what I mean by that is that he acknowledged yes to the question that had to do with health and no to questions that had to do with alcohol or drugs, which is another indicator to me of someone in denial of what is affecting the problem."

The foregoing testimony, reasonably construed, violates the principle of law I have just articulated. No matter what twist the plaintiff tries to place on the language in arguing that the expert was merely advancing her "denial" theory, the fact remains that the testimony amounted to a statement by the expert that Bishop did not knowingly make a misrepresentation in response to question 1(i) on the application.

The jury was told that because the use of drugs was linked to the use of alcohol on the same line, "with Mr. Bishop" that "could feed in to denial." Clearly, this comments on Bishop's intention, knowledge, and belief at the time he answered the question. Additionally, the witness opined that a comparison of the "No" answer to question 1(i) and the "Yes" answers to questions 2 and 3 is "another indicator" that Bishop was not "consciously saying" he needed to conceal his alcohol problem. Manifestly, that answer is "another indicator" that the witness was stating that Bishop did not knowingly give a false answer on the application. That determination was for the jury to make, not the expert witness.

Consequently, I would remand the case for a new trial on all issues due to the foregoing error.