4 F.3d 987
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Cecil B. JACOBSON, Jr., M.D., Defendant-Appellant.
 No. 92-5406.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 2, 1993.
Decided: September 3, 1993.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Chief District Judge. (CR-91-474-A)
 ARGUED: James Roscoe Tate, Tate & Bywater, Ltd., Vienna, Virginia; Jeffrey S. Parker, Arlington, Virginia, for Appellant. Randy I. Bellows, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee.
 ON BRIEF: Richard Cullen, United States Attorney, Office of the United States Attorney, Alexandria, Virginia; Charles P. Rosenberg, Trial Attorney, United States Department of Justice, Washington, D.C., for Appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and WILLIAMS, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Following trial by jury, Cecil B. Jacobson, Jr., M.D., was convicted of fifty-two counts of fraud and perjury stemming from a scheme to cozen patients at his fertility clinic. His direct appeal presents numerous claims in which we find no merit. Accordingly, his convictions and sentence are affirmed.
 
 
 2
 * From 1976 to 1988, Dr. Cecil B. Jacobson, Jr. operated Reproductive Genetics, Inc., in Vienna, Virginia. Although Jacobson had no advanced training in infertility medicine, and did not possess professional qualifications that would have enabled him, under generally accepted medical standards, to hold himself out as an infertility specialist, much of his practice involved the treatment of barren women for infertility. His medical schooling, internship, and residency training qualified Jacobson to practice solely as an obstetrician.
 
 
 3
 Jacobson's infertility treatments involved injections of Human Chorionic Gonadatropin ("HCG"), a hormone derived from the urine of pregnant women, as a means of stimulating ovulation in infertile women. Although HCG is legitimately used in the treatment of infertility, the Government's proof tended to show that Jacobson over-exposed his patients to the hormone, sometimes injecting it continuously up to three times per week for a year or more. Following repeated injections of HCG in massive dosages, many of Jacobson's patients experienced symptoms associated with pregnancy: delayed menstrual periods, bloating, breast tenderness, and nausea. According to testimony presented by the Government's witnesses at trial, the patients, for whom pregnancy had been deeply desired and yet seemingly unattainable, became convinced that Jacobson had worked wonders for them through his HCG treatments. In fact, Jacobson never informed these women that their symptoms were the natural consequence of the HCG injections, not proof of pregnancy. His regular use of HCG, coupled with the high volume of patient appointments his treatments required, reaped substantial profits for Jacobson.
 
 
 4
 In addition to the HCG injections themselves, Jacobson examined his patients for pregnancy with laboratory tests designed to locate the presence of HCG. The result was repeated false pregnancies for many patients: while under Jacobson's care, the Government's trial witnesses alone experienced over fifty false pregnancies. An additional six patients accounted for some thirty such pregnancies.
 
 
 5
 The Government's witnesses further established that Jacobson perpetuated the myth that his patients were pregnant sometimes as late as twenty to twenty-three weeks into the course of a normal pregnancy. He accomplished this feat by the use of false sonograms. Although nothing inside the patient's womb could mimic the presence of a real fetus, Jacobson informed the women that certain images on the sonogram screen irrelevant to the presence of a fetus were in fact the products of conception. According to the Government's witnesses, Jacobson repeatedly told his patients that he observed the limbs of nonexistent fetuses, and that he saw the fetuses sucking their thumbs. What Jacobson in fact represented to his patients were often nearby organs or simply fecal matter.
 
 
 6
 The final element of Jacobson's fraud came into play when he was forced to reveal the true facts to women who thought they were pregnant. This he accomplished by telling his patients that their babies were dead, and by advising those who questioned him about the need for having their uteruses scraped to remove the products of conception (a "D & C"[1] treatment) not to do so. Jacobson discouraged the D & C procedure by informing the women that it could lead to a piercing of the uterus or even a hysterectomy. He also told his patients that the D & C treatment was unnecessary, because the dead fetus would simply "resorb" back into the putative mother's body. Following such "resorptions," women now convinced of Jacobson's ability to help them conceive were led to believe that they were ready for a new pregnancy, and should begin immediately on a fresh cycle of HCG injections and pregnancy tests.
 
 
 7
 On November 21, 1991 a grand jury in the Eastern District of Virginia returned a fifty-three count indictment against Jacobson. The indictment charged (1) thirty-three counts of mail fraud, 18 U.S.C. Sec. 1341; (2) ten counts of wire fraud, 18 U.S.C. Sec. 1343; (3) four counts of travel fraud, 18 U.S.C. Sec. 2314; (4) one count of general perjury, 18 U.S.C. Sec. 1621; and (5) five counts of perjury before a grand jury or court, 18 U.S.C. Sec. 1623.
 
 
 8
 Following a twelve-day trial, the jury returned verdicts of guilty on all fifty-two remaining[2] counts of the indictment. On May 8, 1992, the district court sentenced Jacobson to a term of sixty months' imprisonment, and ordered him to pay (1) a fine in the amount of $75,000.00; (2) restitution to certain of his victims in the amount of $39,205.00; and (3) a special assessment in the amount of $2,600.00.
 
 
 9
 This appeal followed.
 
 II
 
 10
 Jacobson's principal argument on appeal is that the federal criminal fraud statutes, 18 U.S.C. Secs. 1341,[3] 1343,[4] and 2314,[5] cannot be construed as criminalizing his conduct. Jacobson challenges his prosecution under these statutes on the premise that use of the mails, wires, and interstate travel was not an integral part of his medical practice.
 
 
 11
 For the reasons that follow, we reject this premise, and hold that Jacobson's conduct was properly cognizable as fraud under the relevant statutory authorities.
 
 
 12
 The factual predicates for the mail fraud counts of the indictment were (1) Jacobson's repeated attempts to help his patients obtain health-insurance reimbursements for the costs of his infertility treatments, which involved mailing correspondence to certain insurance companies; (2) Jacobson's encouragement that his patients file health-insurance claims for services he knew were fraudulent; (3) Jacobson's use of the mails to reassure his patients that his medical practices were appropriate and scientifically accepted; (4) Jacobson's attempt to encourage new patients to undergo infertility treatment with him by asking former patients to send him, by mail, photographs of their newborn infants, which then would be used as advertising material; (5) Jacobson's use of the mails to obtain and pay for supplies necessary to his fraudulent scheme, such as pregnancy tests and HCG; and (6) Jacobson's use of the mails to send and to receive bills from patients, and to advertise his medical practice.
 
 
 13
 Jacobson suggests that Kann v. United States, 323 U.S. 88 (1944), restricts the application of 18 U.S.C. Sec. 1341 to mailings that are in some respect central to a fraudulent scheme. He relies upon the following sentence in Kann:
 
 
 14
 The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.
 
 
 15
 323 U.S. at 95. While this sentence makes clear that the application of section 1341 is in some respects "limited," it does not define explicitly what it means for a given use of the mails to be "part of the execution of the fraud." Id. The question for decision, therefore, is whether any use of the mails is a sufficient predicate for criminal liability under section 1341, or whether the use must be more substantial.
 
 
 16
 The Supreme Court answered this question definitively nearly four decades ago. To be part of the execution of a fraud, the use of the mails need not be an essential element of the fraudulent scheme. Pereira v. United States, 347 U.S. 1, 8 (1954). It is sufficient for the mailing to be "incident to an essential part of the scheme," id., or "a step in [the] plot," Badders v. United States, 240 U.S. 391, 394 (1916). Moreover, the Supreme Court recently rejected Jacobson's argument that mail fraud can be predicated only upon a mailing which affirmatively assists the perpetrator in carrying out his fraudulent scheme. In Schmuck v. United States, 489 U.S. 705 (1989), the Court spurned a claim that, to invoke 18 U.S.C. Sec. 1314, the mailing element of the fraudulent offense cannot be satisfied by a mailing that is routine and innocent in and of itself, or that is merely tangentially related to the fraud. Id. at 711. Reaffirming Pereira, the Court held that to invoke section 1314, a mailing need not be an essential part of the scheme to defraud, but is sufficient so long as it is "incident to" an essential part of the scheme. Id. at 712.
 
 
 17
 Under the Supreme Court's clear holdings in Pereira and Schmuck, Jacobson's use of the mails was, without question, a sufficient predicate for the Government's invocation of 18 U.S.C.Sec. 1314. The mailings charged by the indictment were incident to essential elements of Jacobson's fraud: inducing, treating, and billing credulous patients who believed they needed his services. We therefore conclude that the mail fraud counts of the indictment were properly grounded in section 1314.
 
 
 18
 The factual predicates for the wire fraud counts of the indictment were telephone calls made by patients for the purpose of scheduling appointments with Jacobson. We have recognized that"the wire fraud statute, patterned on the mail fraud act, was meant to receive [a] like interpretation." United States v. Computer Sciences Corp., 689 F.2d 1181, 1188 n.14 (4th Cir. 1982) (citations omitted), cert. denied, 459 U.S. 1105 (1983). We agree with the Third Circuit Court of Appeals that cases construing the mail fraud statute are"applicable to the wire fraud statute as well." United States v. Giovengo, 637 F.2d 941, 944 (3d Cir. 1980), cert. denied sub nom. Paladino v. United States, 450 U.S. 1032 (1981). The question before us, then, is whether the uses of telephone wires alleged in the indictment were"incident to an essential part of the [fraudulent] scheme." Pereira, 347 U.S. at 8. Because the telephone calls cited in the indictment were incident to Jacobson's ability to schedule patient appointments at which his fraudulent treatments could be administered, we conclude that they constitute a proper predicate for the wire fraud counts of the indictment.
 
 
 19
 In the indictment's travel fraud counts, the Government alleged that Jacobson unlawfully induced certain of his patients to travel in interstate commerce (from the District of Columbia, Maryland, and West Virginia) to his consulting rooms in Vienna, Virginia for the purpose of undergoing infertility treatments. 18 U.S.C. Sec. 2314 provides in relevant part that
 
 
 20
 [w]hoever, having devised ... any scheme or artifice to defraud, ... induces any person or persons to travel in ... interstate ... commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 21
 We observe that the plain language of 18 U.S.C.Sec. 2314 criminalizes "inducements" to travel in interstate commerce for purposes of receiving fraudulent medical treatments. We therefore conclude that the indictment properly charged Jacobson with inducing his out-of-state patients to travel to Virginia in order to undergo fraudulent medical treatment at his infertility clinic in violation of 18 U.S.C. Sec. 2314.III
 
 
 22
 Jacobson's second assignment of error challenges the sentence imposed upon him by the district court. Jacobson contends that the court's decision to depart upward from his established sentence under the United States Sentencing Guidelines was unwarranted and unreasonable. For the reasons that follow, we reject this contention.
 
 
 23
 Following his conviction, Jacobson faced a maximum sentence of 280 years' imprisonment, including 185 years based on the thirty-five counts of the indictment that predated the effective date of the sentencing guidelines. The district court sentenced Jacobson to sixty months' imprisonment on each of the fifty-two counts, the sentences to run concurrently. The court departed upward from the sentencing range established by the guidelines, imposing a sentence nineteen months longer than that permitted by the upper boundary of the guidelines range.
 
 
 24
 A district court may depart from the sentencing range established by the sentencing guidelines only if
 
 
 25
 the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.
 
 
 26
 18 U.S.C. Sec. 3553(b). In reviewing upward departures, we must determine whether the sentence was imposed either in violation of law or as a result of an incorrect application of the guidelines. 18 U.S.C. Sec. 3742(f)(1); United States v. Rusher, 966 F.2d 868, 885 (4th Cir.), cert. denied, 113 S. Ct. 351 (1992).
 
 
 27
 In its written findings with respect to sentencing, the district court supported its decision to depart upward on three bases: (1) U.S.S.G. Sec. 5K2.3 (extreme psychological injury); (2) U.S.S.G. Sec. 5K2.8 (extreme conduct); and (3) U.S.S.G. Sec. 2F1.1 (fraud guidelines failed to capture harmful conduct fully). The court noted that each basis would have been sufficient alone to justify a sixty-month sentence. See United States v. Glick, 946 F.2d 335, 339 (4th Cir. 1991). The court identified the specific factors it believed warranted an upward departure:
 
 
 28
 As a physician the defendant gained his patients' trust, the defendant then abused that trust by lying to his patients in order to defraud them of money and property. The court observed many of the defendant's victims when they testified at trial and also read the many victim impact statements submitted to the court. This court has not seen a case the equal of this one in terms of the degree of emotional anguish, psychological trauma and, at times, profound despair expressed by those victims who took the witness stand and/or wrote to the court to communicate their experiences with the defendant. Several of the defendant's patients continue to suffer psychological trauma as a result of their experience with the defendant.
 
 
 29
 Our review of the record discloses that the district court's findings of extreme conduct, extreme psychological injury, and the guidelines' inability to capture fully the harm of Jacobson's behavior are not clearly erroneous. See United States v. Hummer, 916 F.2d 186, 192 (4th Cir. 1990), cert. denied, 111 S. Ct. 1608 (1991). Having so concluded, we must consider whether the sentencing court abused its discretion in departing from the established guidelines range on the basis of these factors. Glick, 946 F.2d at 339. As noted above, each of the three categories of departure invoked by the sentencing court are plainly contemplated as proper bases for departure by the sentencing guidelines. After reviewing the testimony of the Government's witnesses, we cannot say that the district court abused its discretion by departing upwards from Jacobson's established guidelines sentencing range to the extent of imposing an additional nineteen months' imprisonment upon him. See Hummer, 916 F.2d at 192. We therefore affirm both the district court's decision to depart upwards and the extent of that departure in sentencing Jacobson.
 
 IV
 
 30
 Our careful review of the record and the arguments of counsel discloses that Jacobson's remaining assignments of error[6] are wholly without merit, and therefore warrant no discussion on our part. Accordingly, we affirm the district court's decisions with respect to them forthwith.
 
 V
 
 31
 For the foregoing reasons, Jacobson's convictions and sentence are hereby
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 The acronym "D & C" represents the phrase "dilation and curettage," a surgical procedure wherein the lining of the uterus is scraped. The procedure is frequently used to remove the products of a failed pregnancy
 
 
 [2]
 Count 20 of the indictment, one of the mail fraud counts, was dismissed upon Government motion prior to trial
 
 
 [3]
 Section 1341 of Title 18, titled"Frauds and Swindles," reads in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 18 U.S.C. Sec. 1341.
 
 
 [4]
 Section 1343 of Title 18, titled"Fraud by wire, radio, or television," states in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 18 U.S.C. Sec. 1343.
 
 
 [5]
 Section 2314 of Title 18, titled"Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting," reads in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 18 U.S.C. Sec. 2314.
 
 
 [6]
 These assignments of error included contentions (1) that the Government failed to prove a legally sufficient claim against Jacobson; (2) that the district court's instructions to the jury were erroneous and prejudicial; (3) that the Government's investigatory methods were unconstitutional; (4) that the jury was prejudiced by intense media attention; (5) that Jacobson was deprived of his right to confront his accusers publicly; and (6) that the district court improperly excluded important defense evidence and unlawfully admitted prejudicial prosecution evidence