**ST. PAUL FIRE & MARINE INSURANCE COMPANY,**
**Plaintiff–Appellant,**

v.

**Cecil B. JACOBSON, Jr.; Reproductive Genetics Center, Limited,**
**Defendants–Appellees.**

No. 93–1986.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 7, 1994.

Decided Feb. 17, 1995.

**ARGUED:** Bethany K. Culp, Oppenheimer, Wolff & Donnelly, Saint Paul, MN, for appellant. Nicholas Drakoulis Vlissides, Thomas R. Nedrich & Associates, P.C., Falls Church, VA, for appellees. **ON BRIEF:** David M. Wilk, Oppenheimer, Wolff & Donnelly, Saint Paul, MN; Daniel W. Cotter, Daniel W. Cotter Law Offices, Fairfax, VA, for appellant. Thomas R. Nedrich, Thomas R. Nedrich & Associates, P.C., Falls Church, VA, for appellees.

Before ERVIN, Chief Judge, and WIDENER and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Chief Judge ERVIN and Judge WILLIAMS joined.

1. Jacobson and Reproductive Genetics Center, which Jacobson owned and operated, are the named defendants in the suit before us today. We refer to defendants collectively as Jacobson.

2. Jacobson's criminal convictions involved various schemes designed to lure patients into his fertility clinic. See 826 F.Supp. at 158 n. 2.

## OPINION

WIDENER, Circuit Judge:

Appellant St. Paul Fire and Marine Insurance Company [1] (St. Paul) appeals from an order of the district court denying its motion for summary judgment and granting summary judgment in favor of Dr. Cecil B. Jacobson in a case contesting insurance coverage. We affirm.

### I

In early 1992, Dr. Cecil B. Jacobson, a physician, was convicted of 52 felony counts for mail fraud, wire fraud, travel fraud, and perjury. See *United States v. Jacobson*, No. 92–5406, slip op., 1993 WL 343172 (4th Cir. Sept. 3, 1993) (unpublished), *cert. denied*, —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 364 (1994). These criminal offenses stemmed in part [2] from Jacobson's misconduct in implementing a fraudulent sperm donor scheme in which he injected his own sperm into his patients instead of the promised sperm of the patient's husband or an anonymous donor during artificial insemination procedures at his fertility clinic, Reproductive Genetics Center, Ltd. *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F.Supp. 155, 158 (E.D.Va. 1993).[3] As a result of these activities, which were brought into public light by the 1992 criminal action, at least six civil suits have been filed against Jacobson by the parents of children Jacobson allegedly fathered. 826 F.Supp. at 158. The civil suits allege various counts of fraud, battery, negligence, tort of outrage, negligent infliction of emotional distress, medical malpractice, and child support arising out of Jacobson's providing of professional services.

Pursuant to various reapplications and renewals, Jacobson has held a physicians' professional liability policy with St. Paul Fire and Marine Insurance Company during all

3. Jacobson admitted that he intentionally inseminated patients at his clinic with his own sperm approximately once a month during the time period from 1976 to 1986.

times ·relevant to this action. Under the terms of the policy, St. Paul agreed to defend Jacobson and pay damages in any suits "resulting from . . . [the] providing or withholding of professional services." Jacobson requested that St. Paul defend the pending civil suits described above. In response, St. Paul filed its complaint for rescission or declaratory relief, claiming that St. Paul had no obligation to defend the pending civil suits and was not responsible for any recovery. St. Paul argued that rescission was required because Jacobson's 1986 insurance application contained materially false representations in that he had not disclosed his fraudulent insemination activities, which began as early as 1976, in response to Question # 39 or otherwise. St. Paul also argued that Jacobson's intentional and fraudulent use of his own sperm to inseminate patients was not a "professional service" and thus was not covered under the policy. Lastly, St. Paul contended that Virginia's public policy precluded insuring a wrongdoer against the consequences of his intentional, fraudulent, illegal acts. Both parties moved for summary judgment. The district court denied St. Paul's motion and granted summary judgment for Jacobson because it concluded that St. Paul could not escape responsibility for defending Jacobson under any of its three arguments. This appeal followed.[4]

## II

St. Paul argues that the district court's grant of summary judgment in Jacobson's favor was error based on the same three arguments it made in its complaint for rescission and declaratory relief. We review the

4. Pending the outcome of this action, St. Paul has been defending the underlying civil suits pursuant to a reservation of rights. In the interim between the district court's opinion and this appeal we are told that all but one of the suits have been settled out-of-court. (Jacobson brf. p. 7)

5. St. Paul also contends that the final paragraph of the application imposed an obligation on Jacobson to inform the company of any fraudulent activities as a continuing condition of coverage. The paragraph reads:

Signing this application does not bind the Company to complete the insurance. All information requested in this application is consid-

district court's granting of summary judgment *de novo,* applying the same standard as did the district court. See, e.g., *Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931, 938 (4th Cir.1991); Fed.R.Civ.P. 56(c). We affirm, although on reasoning which differs somewhat from the district court's, especially on the question of public policy.

### A

We first address St. Paul's argument that the district court erred in refusing to rescind Jacobson's policy for material misrepresentation on the reapplication form he filled out in 1986. St. Paul argues that Jacobson had a duty to voluntarily disclose his fraudulent insemination activities to the company, or in the alternative, that he did not truly and fully answer Question # 39 on the application.[5]

Virginia law recognizes that an insurer can rescind an insurance contract for misrepresentation of a material fact in applying for insurance. E.g., *Time Ins. Co. v. Bishop,* 245 Va. 48, 425 S.E.2d 489, 491 (1993); *Mutual of Omaha Ins. Co. v. Dingus,* 219 Va. 706, 250 S.E.2d 352, 355 (1979). Virginia Code Section 38.2–309, governing when recovery on an insurance contract may be barred, provides:

No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue.

 However, it is clear under Virginia law that an insured has no affirmative duty

ered material and important. If the Company agrees to be bound under the terms of this application, your policy is void if you hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter contained in this application.

We are of opinion that this paragraph does no more than require complete disclosure as to the specific questions asked in the application, at the time the application was made. And we question whether that matter was raised in the district court. The memo filed in support of St. Paul's motion for summary judgment does not mention that aspect of the application for insurance.

to volunteer information; rather, an insured is only required to disclose information that is asked of him. *Greensboro Nat'l Life Ins. Co. v. Southside Bank,* 206 Va. 263, 142 S.E.2d 551, 555 (1965). Accordingly, St. Paul is not entitled to rescind the policy simply because Jacobson failed to volunteer information about his past fraudulent conduct, including his donor activities. However, St. Paul's argument that Jacobson withheld material information clearly requested of him on the application requires further consideration. Thus, the only real question as to rescission or escape from liability for misrepresentation is whether Jacobson truthfully answered Question # 39. See *Time Ins. Co.,* 425 S.E.2d at 490.[6]

Question # 39 on the 1986 insurance application asked:

> Do you have knowledge of any pending claims or activities (including requests for medical records) that might give rise to a claim in the future?

Jacobson checked "Yes," and listed two suits against him, "Khamnel vrs. Jacobson—OUT OF COURT SETTLEMENT 1985," and "Dolan vrs. Jacobson—MOTION TO DISMISS FILED JUNE 1986[.]" Since there were not any other activities by patients or others, such as requests for medical records, which led him to believe a claim might be raised in the future, Jacobson argues that he fully and truthfully answered the question. The district court agreed, stating that Question # 39, as fairly read and understood by the ordinary person, asked Jacobson to provide information on any pending claims or activities on the part of third parties that might flag a potential claim.

St. Paul urges us to read the question differently, contending that "activities" means any of the insured's (as opposed to a patient's, law enforcement personnel's, or other third party's) activities in providing professional services which could result in a claim against him. It argues that under such a reading of the question, Jacobson was required to inform St. Paul of his activities in

intentionally and fraudulently inseminating his patients with his own sperm, since he knew that such activities might result in a claim against him.

Nevertheless, we are of opinion that Question # 39 requests only the applicant's knowledge of pending claims or activities on the part of third parties, such as patients or law enforcement personnel, which might give rise to a claim in the future. In other words, "activities" is another word for "pending claims" which includes the stages in a lawsuit pursued by a patient or other third party prior to the actual filing of a claim. The structure of the sentence, including the preceding language regarding "pending claims," and the parenthetical reference to "activities," giving as an example "(requests for medical records)," makes the word "activities" unambiguous. In any case, even if the word "activities" were ambiguous, Virginia canons of construing insurance contracts require us to construe ambiguous language in favor of coverage. See, e.g., *Granite State Ins. Co. v. Bottoms,* 243 Va. 228, 415 S.E.2d 131, 134 (1992) (doubtful or ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it). We are also of opinion that common sense dictates upholding the district court's reading of the question. If St. Paul's interpretation were correct, an applicant physician would have to list almost all of his activities in providing medical services, since arguably each of a physician's activities in treating his patients as he provides medical care could give rise to a future claim. We simply cannot accept that St. Paul intended to compel such information when it would impose a substantial burden on an applicant and be of little value in computing true risk for the company. If St. Paul truly desires such detailed information it will have to request it more clearly.

### B

■ We next turn to St. Paul's argument that Jacobson's activities in fraudulently in-

---

6. The insurer also has the burden of clearly proving that the insured's representation was material to the risk it undertook. *Time Ins. Co.,* 425 S.E.2d at 491. It is clear to us that Jacobson's

activities in inseminating his patients with his own sperm were material to the risk undertaken by St. Paul, and in any case no one has contested the issue.

seminating his patients are not the "providing or withholding of professional services," and are therefore not covered under the policy.

The Policy provides for coverage as follows:

**What this agreement covers**

**Individual coverage.** Your professional liability protection covers you for damages resulting from:

1. Your providing or withholding of professional services.

. . . .

**Additional benefits.** Any of the following are in addition to the limits of your coverage.

We'll defend any suit brought against you for damages covered under this agreement. We'll do this even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if we think that's appropriate.

We agree with the district court that in determining whether an insured physician has engaged in a professional service, courts must look to the nature of the insured's act or the service provided which gave rise to the damages complained of, not merely to the insured's professional status. An act or service of a professional nature arises out of a vocation, occupation, or employment involving specialized knowledge, labor, or skill. See 7A John Appleman & Jean Appleman, *Insurance Law & Practice* § 4504.01, at 309–10 (1981); 43 Am.Jur.2d *Insurance* § 726, at 796; see also *Continental Casualty Co. v. Burton,* 795 F.2d 1187 (4th Cir.1986). While the parties do not take issue with the precise definition of professional services, they disagree as to which of Jacobson's acts one must look to in determining whether the suit

7. This situation is quite similar to that which we faced in *Continental Casualty Co. v. Burton,* 795 F.2d 1187, 1190–91 (4th Cir.1986). In that case we held that, under Virginia law, "professional services" in a professional liability insurance policy encompassed the act of an attorney who was engaged for legal services by a client who subsequently entrusted him with money for investment, where such investment led to the underlying losses. 795 F.2d at 1189–90. In support we cited a case stating the test as:

arose from the providing of professional services. St. Paul argues that the acts from which the damage arose were Jacobson's "production of sperm sample and his fraud and deception," which it argues are clearly not part of a professional service under the above definition and therefore not covered. Jacobson argues, and the district court agreed, that while Jacobson's production of sperm did not require any medical skill, the act complained of in the complaint was the "fraudulent use of his own semen to inseminate patients" rather than using the sperm of an anonymous donor or the patient's husband, acts which necessarily required the application of his medical knowledge and special skills in the actual act of inseminating the patients. We agree with Jacobson.[7] The act complained of in the instant civil actions necessarily included the medical act of inseminating the patient—as the mere production of sperm with nefarious intent was not the basis of the underlying claims against him. This act of insemination required the application of Jacobson's special learning and technical skill as a fertility specialist, and thus is a professional service under the terms of the policy.

### C

Finally, St. Paul contends that it is absolved from liability for Jacobson's acts because those acts are Jacobson's intentional conduct. Because there is coverage under the policy, as there was here, there being no express exclusion from coverage under the policy of Jacobson's intentional acts, St. Paul relies on the decision in *Fedele v. National Liberty Insurance Co.,* 184 Va. 528, 35 S.E.2d 766 (1945), for the proposition that the public policy of Virginia precludes an insurance company from being forced to indemnify an insured for his intentional, fraudulent conduct. The district court agreed that

[T]he controlling circumstance is whether the attorney was in fact engaged for the purpose of obtaining his legal services. If he was so engaged, then the fact that in the course of the rendition of the services he stepped beyond the strictly legal role to undertake to render services which were a non-lawyer could render, would not justify the conclusion that he was engaged other than as a lawyer. . . .

795 F.2d at 1190–91 n. 2 (citation omitted).

Virginia public policy generally excludes coverage for intentional wrongdoing and rested its holding on an exception to the general policy.

We do not agree with the district court that there is a general public policy in Virginia which amounts to a prevention of insurance coverage for intentional wrongdoing, but we do agree with the result it obtained.

■ Initially, we note that "[u]nder *Erie Railroad v. Tompkins* [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ], the federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion." *Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir.1993) (refusing to apply a discovery rule to a Florida contractual notice provision where no Florida case had done so). All the more, the federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy. See, e.g., *Griffin v. McCoach*, 313 U.S. 498, 503, 61 S.Ct. 1023, 1025, 85 L.Ed. 1481 (1941) ("[I]t is for Texas to say whether its public policy permits a beneficiary of an insurance policy . . . to recover. . . ."); *St. Paul Mercury Ins. Co. v. Duke Univ.*, 849 F.2d 133, 136 (4th Cir.1988) (Federal courts "must enforce contracts as written in the absence of a clear and dominant public policy forbidding enforcement."). Thus, we will not attempt to decide the public policy of the State of Virginia absent a clear and dominant articulation of that policy by the Commonwealth herself. In this case, we find no such articulation.

Although *Fedele* is now in its fiftieth year, the Virginia Court has never cited that case for the proposition argued by St. Paul and has never expanded the statement made in *Fedele* of what public policy is offended.[8] The Court there stated the proposition:

It is elementary that principles of public policy deny the right of coverage to an insured who fraudulently sets on fire the property covered by the contract of insurance.

*Fedele,* 35 S.E.2d at 766, 767.[9]

Sitting as a diversity court, we have ascertained that *Fedele* announces the public policy of Virginia to be that an insured who fraudulently sets on fire the property covered by the contract of insurance may not recover for the loss from the fire insurance company. The state courts have not expanded that public policy. The insurance policy as written in this case requires coverage. No public policy of Virginia has been brought to our attention which would forbid enforcement of the insurance policy, much less a clear and dominant public policy. Accordingly, we decline to extend the public policy as announced in the *Fedele* case so that coverage in this case would be obviated. Any such extension is a matter for the state courts.

The judgment of the district court is accordingly

*AFFIRMED.*

8. The only reference to the merits of *Fedele* in any reported case is that of this court in *Atlantic Permanent Federal Savings & Loan v. American Casualty Co.*, 839 F.2d 212, 217 (4th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988), in which we rejected the application of *Fedele* to the facts in that case because we held that any *Fedele* public-policy prohibition did not apply when the insured acted without the specific intent to cause harm, a condition present here, in any event.

9. St. Paul does not depend on the line of cases following *Eagle, Star & British Dominions Insurance Co. v. Heller*, 149 Va. 82, 140 S.E. 314 (1927), which held that a convicted arsonist could not recover insurance proceeds for the burning of the property insured. The Court held that as a matter of public policy the criminal judgment was admissible as evidence in the civil trial and that when so admitted into evidence, a verdict for the defendant was required. *Heller,* however, has been construed in Virginia in *Selected Risks Insurance Co. v. Dean*, 233 Va. 260, 355 S.E.2d 579 (Va.1987), as not applying in a case in which an insured (Dean) had been convicted of unlawful wounding for striking a pedestrian with his car. His insurance company sought to evade coverage for the injuries to the pedestrian by claiming that the insured had been convicted of an intentional act. The Court refused to extend the *Heller* exception because the insured in the *Dean* case had not sought to recover from the insurance company damages for his own wrong. There is even less reason for us as a federal court to extend the rule in *Fedele* than there was for the Virginia court in *Dean* to extend the rule of *Heller*, which it declined to do.